1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEW JERSEY

3    INTER CITY TIRE AND AUTO    .
     CENTER, INC., et al.,       .
4                                .
          Plaintiffs,            .
5                                .   Case No. 2:13-cv-02590
                                 .
6    vs.                         .
                                 .   Newark, New Jersey
7    MICHELIN NORTH AMERICA,     .   January 16, 2015
     INC., et al.,               .
8                                .
          Defendants.            .
9    . . . . . . . . . . . . . . .

10

11                    TRANSCRIPT OF HEARING
              BY THE HONORABLE MICHAEL A. HAMMER
12              UNITED STATES MAGISTRATE JUDGE

13

14   APPEARANCES:

15   For the Plaintiff,        JOSEPH P. LASALA, ESQ.
     Inter City and Auto       McElroy, Deutsch, Mulvaney,
16   Center, Inc.              And Carpenter, LLP
                               1300 Mount Kemble Avenue
17                             P.O. Box 2075
                               Morristown, NJ  07962
18                             (973)993-8100
                               Email: jlasala@mdmc-law.com
19

20                             MICHAEL J. CONNOLLY, ESQ.
                               Hinckley Allen
21                             28 State Street
                               Boston, MR. MACK:  02109
22                             (617) 345-9000
                               Email: mconnolly@hinckleyallen.com
23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

2

```
 1   For the Defendant           RICHARD BERNARD BROSNICK, ESQ.
     Somet Truck Center          Akerman LLP
 2   NJ, LLC:                    666 Fifth Avenue, 20th Floor
                                 New York, New York  10103
 3                               (212)  880-3800
                                 Email: richard.brosnick@ackerman.com
 4
     For the Defendant           KATHLEEN N. FENNELLY, ESQ.
 5   Michelin North             Graham Curtin, PA
     America, Inc. And           4 Headquarters Plaza
 6   Michelin Retread            P.O. Box 1991
     Technologies, Inc.:         Morristown, NJ  07962
 7                               (973) 292-1700
                                 Email: Kfennelly@grahamcurtin.com
 8
                                 PETER W. HERZOG, III, ESQ.
 9                               Bryan Cave, LLP
                                 One Metropolitan Square
10                               211 North Broadway, Suite 3600
                                 St. Louis, MS. OHM:    63102
11                               (314)259-2353
                                 Email: www.bryancave.com
12
     For the Defendant           BRIAN R. TIPTON, ESQ.
13   Service Tire Truck          Florio, Perrucci, Steinhardt
     Centers, Inc.:              And Fader, LLC
14                               235 Frost Avenue
                                 Phillipsburg, NJ  08865
15                               (908) 454-4570
                                 Email: btipton@florioperrucci.com
16
     Audio Operator:             Unknown
17
     Transcription Service:      KING TRANSCRIPTION SERVICES
18                               901 Route 3 South, Center Suite 3
                                 Pompton Plains, NJ 07444
19

20

21

22

23

24

25
```

Proceedings                                3

1        (Commencement of Proceedings at 10:21:42 a.m.)

2        THE COURT:  All right.  This is the matter of

3   Michelin North America, et al., versus Inter City Tire as well

4   as Intercity Tire versus Michelin North America.  The docket

5   number in this matter is  civil number 13-2590.  We're

6   continuing the hearing from Tuesday with respect to the

7   subpoena issues.  Can I have appearances, please, starting with

8   plaintiff.

9        MR. CONNOLLY:  Michael Connolly, co-counsel for Inter

10   City Tire, Your Honor.

11        MR. BROSNICK:  Richard Brosnick from Akerman LLP for

12   Somet, non-party Somet Truck Center.

13        THE COURT:  All right.  And then who do we have on

14   the telephone please?

15        MS. FENNELLY:  Good morning, Your Honor.  Kathleen

16   Fennelly from Graham Curtin on behalf of Michelin.

17        MR. LASALA:  Good morning, Your Honor.  Joseph Lasala

18   of McElroy, Deutsch for Inter City.

19        MR. HERZOG:  Peter Herzog, Your Honor on behalf of

20   Michelin North America.

21        MR. TIPTON:  Brian Tipton on behalf of Service Tire

22   Truck Centers.

23        THE COURT:  Is that everybody?  All right.  Do I have

24   counsel on for Michelin?

25        MS. FENNELLY:  Yes, Your Honor.

```
                              Proceedings                        4
```

1        MR. HERZOG:  Yes.

2        THE COURT:  All right.  I just wanted to make sure.

3   All right.  Let me start with the application that was filed

4   last night by Michelin and Service Tire Truck Center for a stay

5   pending the motion in South Carolina for a protective order.

6   Mr. Connolly I assume you want to address that?

7        MR. CONNOLLY:  Your Honor, I received that this

8   morning.  I was only able to read it over the phone.  So I'm

9   afraid that I may not have gotten all of the, all of the

10   papers.

11        But as the Court ruled earlier this week the

12   discovery served in this case was all timely served.  The only

13   reason that we are pursuing this outside of the discovery

14   period set by the court in South Carolina is the third party

15   has exercised its rights to object to the discovery.

16        So Inter City is not seeking discovery outside of the

17   discovery period.  And as I mentioned to the Court, myself and

18   attorney Celeste Jones, who was on the call earlier in the

19   week, Judge Herlong has already denied a motion for a

20   protective order filed by other third parties seeking to defeat

21   discovery that was exactly the same as this.  Discovery that

22   was propounded within the discovery period but those parties

23   filed objections and motions to quash and so forth.  And Judge

24   Herlong in effect allowed that third party discovery to proceed

25   by denying immediately the motions for protective order filed

Proceedings                                              5

1    there.

2           THE COURT:  Does anybody else want to be heard.

3    Obviously I already have them.

4           MR. BROSNICK:  Your Honor, if I may.

5           THE COURT:  Let me hear from Mr. Brosnick.

6           MR. BROSNICK:  Before, obviously Michelin's counsel

7    will speak to the merits of their application, but as a non-

8    party already overburdened with expense in this matter to the

9    extent there is even a one percent chance that Judge Herlong

10   may not allow discovery to be used.  The second to the last

11   thing I want to say to my client is you need to do more work

12   than you've already done and pay me more.  The last thing I

13   want to say is you need to do it even though it may not be able

14   to be done, used at all.

15          So at the very least, and we're all here today, so I

16   have no objection, in fact I think I consent to continue with

17   Somet's motion to quash and try to resolve it on the merits.

18   But to the extent that it is going to be anything I

19   respectfully request to join Michelin and as to Service Tire's

20   request that it be stayed pending a ruling from South Carolina.

21          THE COURT:  All right.  And then lastly does Michelin

22   or Service Tire want to be heard?

23          MR. HERZOG:  Yes, Your Honor.  Michelin would ask to

24   be heard briefly.  Responding to Mr. Connolly's points and just

25   to reiterate some of the points that we made on the record

1   during the last hearing, Your Honor, we basically agree

2   entirely that discovery sought by Inter City is timely.

3   Whereas I mentioned previously, Judge, there's a requirement

4   under the South Carolina rules that any discovery sought be

5   capable of being completed before the discovery cutoff.

6           We put in our papers information that indicated that

7   Inter City was aware of and in fact making allegations with

8   respect to the subject matters of their dispute or on which

9   they seek discovery at this late date as early as February of

10  2011.  Two years before the discovery, the litigation in this

11  case was even commenced and even longer before the time period

12  for discovery in our case expired.

13          As I mentioned last time, under Rule 37 of the

14  Federal Rules of Civil Procedure specifically provide that a

15  motion for an order to a party must be made in the court where

16  the action is pending.  A motion for an order to a non-party

17  must be made in the court where the discovery is or will be

18  taking.

19          And so we took the Court's suggestion, your

20  suggestion, Judge Hammer, and filed a joint motion asking Judge

21  Herlong to preclude any further discovery by a party, Inter

22  City in this case.  The application that Mr. Connolly referred

23  to and that South Carolina counsel referred to when we were

24  last before the Court was an application by a non-party and the

25  judge has routinely denied those applications as having been

```
                          Proceedings                        7
```

1    made in the wrong court.

2           We have now made an application.  We believe that the

3    discovery sought is untimely.  We believe that serving a notice

4    of deposition in seeking additional documents as of December

5    2nd, with a December 12th discovery cutoff, knowing all of this

6    information for years before that discovery was served, renders

7    that untimely.

8           We also believe, Judge, that with the pending trial

9    scheduled to begin February 2nd with the pretrial obligations

10   that are due between now and then, including meeting and

11   conferring, exchanging exhibits, motions for summary judgment,

12   motions in limine, and requests for jury instructions and the

13   like, that it severely prejudices our ability to get ready for

14   trial by conducting discovery that we didn't believe that can

15   be used because it is being pursued over our objection and

16   because it's untimely.  And it interferes with out ability to

17   get ready for trial.

18          And so we would ask the Court, Judge Herlong is very

19   prompt in his rulings.  Mr. Connolly and Mr. Lasala or their

20   South Carolina counsel can get an opposition to our motion for

21   protective order on file very quickly and the judge will rule

22   by text order.  That's how he has done it.

23          And we think that this Court ought to wait for the

24   South Carolina court, which has jurisdiction over the trial, to

25   determine whether any further discovery outside of its deadline

Proceedings                                          8

1   should be allowed to occur, particularly because, as Somet's

2   counsel indicated, all of this effort and expense could be for

3   not if Judge Herlong decides that even after it goes forward

4   that it will not be allowed to be used.  Thank you, Judge.

5            THE COURT:  All right.  Thank you.  I have read the

6   arguments, much of which is essentially a rehash of what we

7   discussed on Tuesday.  To be clear I  never, certainly never

8   suggested that any party file this motion.  It's up to counsel,

9   obviously, to do what they think is appropriate.

10           I've already rejected in fact on Tuesday, Michelin's

11  argument that the discovery couldn't have been produced within

12  the discovery cutoff and therefore was untimely.  So I won't

13  dwell on that except to point out that at issue in part are

14  subpoenas that were served in October with compliance dates in

15  October.  That, for example, would be the subpoena to Somet

16  with a return date of October 15th, well before the discovery

17  cutoff.  At least some parts of which are very much in dispute

18  at this time.

19           That would also include the Chase subpoena and the

20  J.P. Morgan Chase subpoena, both of which were served in

21  November with a production date within the discovery cutoff

22  period.  And the closest one really ends up being the 30(B)(6)

23  subpoena, because that subpoena was issued on December 2, 2014

24  with a compliance date of December 12, 2014.  Of course

25  December 12th being the last day for fact discovery.

1          So that one does, is probably the closest example.

2     But even that allowed a ten day period for compliance and

3     wasn't a document production.  It's a Rule 30(B)(6) deposition.

4     Now I'm certainly aware of the fact that Somet argues that, and

5     I think some of this is borne out by the subpoena which we'll

6     be addressing today, seeks such a broad array of topics that

7     certainly preparation that would have been I think difficult

8     given the, I think it was several dozen topics being sought by

9     way of that subpoena.

10          But I certainly can't find, and I already held this

11    on Tuesday, that those subpoenas seek discovery that could not

12    have been completed within the cutoff period.  Certainly, and

13    this was I think further to my thought on Tuesday, I'm also

14    sensitive to Somet's argument that Judge, we shouldn't have to

15    produce this material if it's only going to be excluded later.

16    But as I concluded on Tuesday if it is the case that the

17    discovery could be produced within the discovery cutoff period,

18    I don't know exactly how much that argument flies.

19          Now obviously that's not an issue before me. That's

20    going to be an issue before Judge Herlong as the gatekeeper in

21    terms of evidence at trial being the trial judge.  But that's

22    true of all discovery and all exhibits that the parties want to

23    seek to move into evidence.

24          So while I'm certainly sensitive to Somet's argument

25    the fact that we're doing this discovery now once the court

1    concludes that this discovery that was sought before the

2    discovery cutoff period and they can be reasonably produced

3    within the discovery cutoff period, I don't that qualitatively

4    that discovery then somehow ends up being more vulnerable to

5    exclusion than any other exhibits that were obtained through

6    the discovery process.

7            Ultimately in this court motions to stay are not

8    favored.  A stay will not be granted absent a showing of good

9    cause because, and this is certainly true here, when discovery

10   is delayed or prolonged it can create case management problems

11   impeding the court's responsibility to expedite discovery and

12   cause unnecessary litigation expense and problem.  See, Coca

13   Cola Bottling v. Grol., G-R-O-L, 1993 West law 13139559 at page

14   2, Eastern District of Pennsylvania, March 8, 1993.

15           The court therefore must find good cause in order to

16   issue a stay.  That requires balancing the parties' interests,

17   the interest of the court, and the public's interest in a just,

18   speedy, and efficient resolution of the claim.  See, In Re

19   Classic Added Antitrust Litigation (phonetic), 2004 West law

20   2743591 at page five, Eastern District of Pennsylvania,

21   November 29, 2004.

22           In order for this Court to stay the litigation it

23   would have to find that there is substantial merit to

24   Michelin's argument that ultimately the protective order will

25   be entered and should be entered by Judge Herlong.  Obviously

Proceedings                        11

1    that's entirely His Honor's decision and entirely His Honor's

2    decision as to what is allowed into evidence at trial.

3         But based on the record before me and having already

4    concluded that the discovery being sought here was timely

5    served in terms of the service of the subpoena, I cannot find

6    that there is substantial merit to Michelin's application.

7    Therefore I am going to respectfully deny the motion to stay

8    and we will proceed now to the subpoena issues.

9         Now, as I understand it counsel, we have before us

10   four subpoenas that are at issue in all or in part.

11        MR. BROSNICK:  That's correct, Your Honor.

12        THE COURT:  All right.  Parenthetically by the way I

13   just realized that was actually the beginning of my decision on

14   the stay was actually quoting the Coca Cola Bottling v. Geol.

15   decision.  If I didn't note that earlier that was actually a

16   direct quote.

17        All right.  So if I understand correctly at issue at

18   this point are item two -- well lets deal first with the

19   subpoena that Inter City issued to Somet on October 8th,

20   returnable on October 15th.  I just want to give an overview of

21   sort of what's at issue first.  And then we'll come back to

22   each one and deal with it.  All right.

23        So with respect to the subpoena that ICT issued to

24   Somet Tire returnable October 15th, what's still at issue,

25   well, when the parties first presented this dispute, item two

Proceedings                                    12

1   was an issue, item 20R was an issue, item 20S was an issue, and

2   item 21 was an issue.

3          If I understand correctly two things have changed

4   since then.  One is the cutoff date.  It had said to the

5   present, but during the January 13th hearing I believe Inter

6   City agreed to limit the end date of that production to the end

7   of 2013.  Is that correct?

8          MR. CONNOLLY:  Earlier, Your Honor.  April of 2013.

9          THE COURT:  To April of 2013.  Okay.  The other thing

10  is if I recall correctly also items 20R and 20S, were those

11  withdrawn?

12         MR. CONNOLLY:  Yes, Your Honor.

13         THE COURT:  Okay.  So those were withdrawn.  So what

14  we have left from, was it April 1st, you said, 2013?  Sorry.

15         MR. CONNOLLY:  --

16         THE COURT:  April?

17         MR. CONNOLLY:  What if we make it the end of April?

18  The litigation was commenced in the middle part of that month.

19         THE COURT:  I'm not sure Mr. Brosnick, that's going

20  to much affect Mr. Brosnick's position on the subpoena.

21         MR. BROSNICK:  Your Honor, yeah.  The difference

22  between, it's not irrelevant, but the difference between seven

23  years worth of records and eight plus years of records is

24  perhaps not a distinction.

25         THE COURT:  Okay.  So that's what's at issue at the,

Proceedings                                13

1   with respect to the October subpoena.  With respect to the

2   30(B)(6) subpoena essentially the entirety of that is at issue

3   still.  Right?

4          MR. BROSNICK:  Yes, Your Honor.

5          THE COURT:  Okay.  So we've really got our work cut

6   out for us on that.  The other two are the subpoenas that Inter

7   City issued to Chase Bank, U.S.A., and J.P. Morgan Chase.

8   Those are at issue.  Right?

9          MR. CONNOLLY:  Yes, Your Honor.

10         THE COURT:  Okay.  Is there anything else at this

11  point that's in issue?  Or is that -- that's a pretty full

12  plate but if there's anything else I'd rather know it now.

13         MR. BROSNICK:  I believe what Mr. Connolly's -- I

14  believe Somet fully complied with the first subpoena that was

15  issued on it and the second subpoena was issued improperly

16  through an affiliate.  But there was no issue with cooperation

17  in working with counsel.  Somet didn't object for the first

18  time until it received the third --

19         THE COURT:  Yeah.  Certainly nothing has been

20  presented to me that suggests that the first subpoena is at

21  issue.  All right.  So lets turn our attention to, you  had

22  documents that you had given -- I need to take a two second

23  break.  I just realized I left those in chambers.  I'll be

24  right back.

25             (Brief pause.)

Proceedings                              14

1    THE COURT:  The subpoena that was returnable on

2   October 15th, and I want to move this along folks.  We've

3   already obviously dealt with a number of the issues.  So, Mr.

4   Connolly, go ahead.  You've got, you can take the lead on this

5   since you're looking to compel compliance.  And I'm right,

6   we're down to item two, which is essentially the downstream

7   information, and item 21, which essentially is who owns what

8   when it comes to Somet Tire?

9    MR. CONNOLLY:  Yeah.  And as to that, Your Honor, I

10  think that's a pretty simple issue.  We are interested in

11  knowing what Mr. Cohen's percentage ownership in Somet Tire is.

12  Mr. Cohen has submitted an affidavit to this Court indicating

13  that he is a principal of Somet Tire.  I gather from that that

14  he's saying he's at least a part owner.  And we simply seek to

15  know what his ownership interest is.

16   THE COURT:  Tell me why.  I mean why is that

17  relevant?  How does that help you with trial?

18   MR. CONNOLLY:  Well because Mr. Cohen is not just a

19  present principal of Somet Tire and has worked there since, as

20  he says in his affidavit, 2007.  He's a former employee of

21  Inter City Tire.  And in conjunction with his employment with

22  Inter City Tire during a period of time when Inter City --

23   THE COURT:  And there was litigation about that.

24  Right?  Previously?

25   MR. CONNOLLY:  There was a violation of a non-compete

Proceedings                                    15

1   agreement.  Correct.  When Mr. Cohen left, correct.

2             THE COURT:  Okay.

3             MR. CONNOLLY:  But the point that I wish to make is

4   that, and it really is -- well let me just say the fact that he

5   worked at Inter City Tire during a period of time when Inter

6   City was an authorized Michelin dealer and a retread franchisee

7   is important here because in his roll working at Inter City

8   Tire he became familiar with the Michelin policies and

9   procedures which are at the heart of the litigation between

10  Inter City and Michelin and Service Tire.

11            And so we believe that that is important contextual

12  information for the jury to hear in the South Carolina case.

13  We don't need to get elaborate documentation on his ownership

14  interest.  In fact if Mr. Cohen is selected as the, or one of

15  the 30(B)(6) witnesses, if the Court permits that deposition to

16  proceed, we can simply inquire of him on the record what his

17  ownership interest is.  And that would satisfy our interest.

18            THE COURT:  And you actually anticipated one of my

19  questions.  Has Mr. Cohen been deposed in this case?

20            MR. CONNOLLY:  He has not.

21            THE COURT:  He has not.  Okay.  All right.

22            MR. CONNOLLY:  And I won't speak for Mr. Brosnick,

23  but Mr. Brosnick did suggest that he may be, if the Court

24  requires a 30(B)(6) deposition, he may be one of Somet's

25  designee if not it's only designee.

Proceedings                                    16

1          MR. BROSNICK:  Your Honor, just to speak to that.

2   One of the many aspects of burden on the 30(B)(6), I know I'm

3   jumping ahead.

4          THE COURT:  Yeah.  I don't want to jump ahead because

5   I get confused too easily.

6          MR. BROSNICK:  The idea is there isn't really one

7   person, Somet doesn't have many employees, but the subpoena is

8   so broad that there isn't really any one employee who could

9   possibly speak to it all.

10          THE COURT:  Okay.  All right.  So in other words it's

11   essentially contextual because you want to be able to argue I

12   guess at some point that Somet knew of these pricing strategies

13   because Cohen worked at Inter City and learned of these and

14   then essentially took that information with him to Somet?

15          MR. CONNOLLY:  Correct.

16          THE COURT:  And so the context is and he has an

17   interest in this because he has some ownership interest?

18          MR. CONNOLLY:  Correct.

19          THE COURT:  Okay.  All right.  Mr. Brosnick why isn't

20   that relevant?

21          MR. BROSNICK:  I would say, well the extent to which

22   the fact that Mr. Cohen worked at Inter City a decade ago is

23   relevant as to what Michelin's policies were in 2003, '04, and

24   '05.  That may or may not be relevant, but it's not what's at

25   issue.

Proceedings                    17

1    What's at issue is entirely separate from that which

2    is, is it relevant whether Mr. Cohen owns a tenth of a percent

3    or 50 percent, or 99 percent of Somet?  And I would say that is

4    totally irrelevant.  It's undisputed that he is a principal and

5    that he is an employee.

6        THE COURT:  Well you just said whether he owns one

7    percent or 99 percent is totally relevant.

8        MR. BROSNICK:  It's totally irrelevant.  I-R-R-E-L --

9        THE COURT:  Okay.

10       MR. BROSNICK:  He is an employee of Somet.  He was a

11   decade ago an employee of Inter City.  That's undisputed.  All

12   that's at issue here is whether the personal ownership stake of

13   a non-party who is not even subject to subpoena, could have

14   been subpoenaed and was not even subject to subpoena.  But

15   there is personal information will be disclosed.

16       And I would say if the point is to show some kind of

17   a bias at trial, then the fact that he works for Somet, even if

18   he was just lets say an officer -- that alone would be satisfy

19   whatever minimal relevance.

20       THE COURT:  But you haven't even identified him as an

21   officer.  I mean you've said, I think you've agreed that he's a

22   principal.  But that's a relatively vague term, isn't it?

23       MR. BROSNICK:  He's a principal and an employee.

24   Somet is a small enough company that they don't have a formal

25   officers.  The title is he is a principal and an employee.  But

Proceedings                                    18

1   I think what we're talking about, and remember, I don't need to

2   remind Your Honor, it's not -- it's about weighing relevance

3   and burden and the imposition on a third party.  We have, the

4   entire point that he used to work at Inter city is, I don't

5   even know why that's been mentioned.  That has nothing to do

6   with his ownership stake in Somet.

7          The question is whether the contextual potential

8   relevance of how much he owns on top of being an employee

9   outweighs invading the personal financial stake and forcing a

10  human being, an individual, not even a corporation, to disclose

11  that.

12         THE COURT:  I'm going to allow Inter City to take

13  discovery on that issue.  And it's going to be limited as Mr.

14  Connolly offered to Mr. Cohen's particulars ownership stake in

15  Somet.  I find number one that it is relevant.  If Inter City's

16  theory here is that, and I don't know if there's any dispute

17  that Inter City and Somet are direct competitors, and that Mr.

18  Cohen had information or part of that information as an Inter

19  City employee while Inter City was an authorized Michelin brand

20  dealer and learned about Michelin's pricing strategies.

21         And further part of Inter City's theory here is that

22  Somet, and Mr. Cohen particularly, went to some length to

23  essentially undercut Inter City's pricing.  And I understand

24  that these are still allegations that have to be proven at

25  trial.  But that's certainly relevant information.

Proceedings                                    19

1       It's one thing to say an employee is motivated to do

2   that because of an employee of Somet.  It's a whole other issue

3   though entirely, and I do agree with Mr. Connolly contextually,

4   if that person has an actual ownership interest and therefore a

5   much more direct stake in Somet's profitability and revenue.

6       In terms of burden certainly, unlike some of the

7   other requests that Inter City has made here, the burden here

8   is minimal.  This does not require any extensive document

9   production.  It could be answered if the deposition proceeds in

10  the form of a deposition.  If the deposition isn't allowed to

11  proceed in the form of a single interrogatory.

12      And nothing about this would constitute a trade

13  secret under the New Jersey definition of trade secret

14  information.  Therefore I'm going to allow that.  So lets turn

15  now to -- we'll come back to the format by which to do that

16  once we're ruled on some of the other issues.  And I think the

17  options become clearer.

18      Lets talk about item number two.  These are the

19  documents that refer, et cetera, to Somet's sale of Michelin

20  brand tires from 2006 to 2013.  The so-called downstream

21  information.

22      So let me start with you, Mr. Connolly.  What

23  specifically do you want?  Because quite frankly when I look at

24  item number two it seems to be that you want everything.  In

25  other words you want everything for 2006 to 2013 reflecting any

Proceedings                                        20

1   sale by Somet of Michelin brand tires.  And I've got to tell

2   you, sir, that is extremely broad.

3          MR. CONNOLLY:  Your Honor, let me tell you what Inter

4   City would like to obtain from Somet and qualify our request

5   with the notion that we're prepared to be flexible in the

6   manner in which we receive the information.

7          So one possibility may be that in lieu of getting all

8   of the invoices that reflect Somet Tire's sales of Michelin

9   tires during the time frame, if that information can be printed

10  out in a spreadsheet from an electronic database maintained by

11  Somet, that may be acceptable.

12         THE COURT:  But wait.  So you envision this database

13  containing what information exactly?

14         MR. CONNOLLY:  We'd like to know the customers who

15  have purchased Michelin products from Somet Tire during the

16  relevant time frame.  And we'd like --

17         THE COURT:  So you want basically a customer list?

18         MR. CONNOLLY:  Well not all their customers.  Just

19  the customers that have purchased Michelin tires.

20         THE COURT:  Okay.  For a seven year span.

21         MR. CONNOLLY:  Well, you know, our request begins in

22  2006, but Mr. Cohen indicates that he didn't arrive at Somet

23  Tire until 2007.  So --

24         THE COURT:  Okay.  Six year span.

25         MR. CONNOLLY:  -- 2007 through April of 2014 is, 2013

```
                        Proceedings                    21
```

1    rather is the period that we're interested in.

2         THE COURT:  Okay.  But with regard to that you want,

3    what you're looking -- are you  just looking for a list of

4    customers?  In other words, because --

5         MR. CONNOLLY:  No.  We want more.

6         THE COURT:  Okay.  What else do you want?

7         MR. CONNOLLY:  We'd like to know the prices paid by

8    Somet Tire's customers for Michelin tires.  And in conjunction

9    with that the exact model of Michelin tire being sold to the

10   customer.  And then there's another --

11        THE COURT:  Okay.  Go ahead.

12        MR. CONNOLLY:  -- area.  Part of Inter City's lost

13   profits damages case, Your Honor, is that we lost customers as

14   a result of this price discrimination/tire diversion scheme.

15   And when Inter City Tire loses customers, customers who buy

16   Michelin tires, those customers don't buy only Michelin tires.

17   They come in and seek other services as well.

18        THE COURT:  Right.

19        MR. CONNOLLY:  And part of our damages case --

20        THE COURT:  Right.  They need a new battery for

21   example, or a new alternator.

22        MR. CONNOLLY:  Alternator, exactly.

23        THE COURT:  Uh-huh.

24        MR. CONNOLLY:  And so that's part of our damages

25   case.  So we want to know what other services were sold by

Proceedings                                          22

1   Somet to the customers who purchased Michelin products.  Not
2   all of their customers, just those who purchased Michelin
3   products.
4           THE COURT:  So you essentially want two categories of
5   customers that will have some degree of overlap.  I guess one
6   would be a subset within the other.  Right?  You want all of
7   the customers who purchased Michelin brand tires for 2007 until
8   April 2013.  And then specifically broken out within that if
9   they bought anything else along with their Michelin brand tires
10  you want to know who they were and what they bought.
11          MR. CONNOLLY:  Right.
12          THE COURT:  Okay.
13          MR. CONNOLLY:  And within that universe of
14  information we want to know the prices paid for the Michelin
15  products.
16          THE COURT:  Uh-huh.
17          MR. CONNOLLY:  Now when the Court is ready I'll go
18  into the reason why that's important to Inter City in
19  connection with the South Carolina case.
20          THE COURT:  Okay.  Go ahead.  I'm ready.  Is there
21  anything else that you want on item number two?
22          MR. CONNOLLY:  I think that's it.
23          THE COURT:  Okay.  If you need a minute to confer
24  that's fine.
25          MR. CONNOLLY:  In conjunction with the transactions

Proceedings                                          23

1   and the pricing information we'd also want the quantity of the

2   tires sold.  So pricing, model, quantity.

3          THE COURT:  All right.  Tell me why this is relevant.

4   And remember -- well, let me start out with this.  Can we agree

5   this is trade secret information?  There's a lot of cases that

6   have held this is exactly the epicenter of trade secret

7   information, aren't there?

8          MR. CONNOLLY:  Your Honor, that's a very good

9   question.  And I've given further thought to the issue since

10  then and read some cases.  And read the case that Mr. Brosnick

11  indicates that he's principally relying on.

12          THE COURT:  The Cytodyne case?

13          MR. CONNOLLY:  Yes.

14          THE COURT:  Because I do recall you agreed with me on

15  Tuesday that at least some of this information is trade secret.

16  I assume this is among that category.

17          MR. CONNOLLY:  Yes.  But I don't think it's as simple

18  as is it trade secret, yes or no.  And if it is then that's

19  case determinative.  Because the way I read the case law, Your

20  Honor, is that there is information that is commercially

21  sensitive information.  But there's a whole wide array of how

22  sensitive that information is.  And that's a factor that courts

23  take into account in deciding in balancing need versus harm as

24  to what ought to be disclosed.

25          And so what I understand Somet to be claiming to be

Proceedings                                          24

1   commercially sensitive information here, I understand it to be

2   three things from having read Mr. Cohen's affidavit.

3          One is the pricing information.  Two is the customer

4   list, the identity of the customer.  And three is the mix of

5   service and products that are purchased by those particular

6   customers.

7          THE COURT:  All of which you're seeking in item

8   number two.

9          MR. CONNOLLY:  All of which we're seeking in item

10  number two.  That's correct, Your Honor.

11         THE COURT:  Right.

12         MR. CONNOLLY:  And so what I would say to the Court

13  is can that information be trade secret information?  It can be

14  as an abstract point.  Whether or not it is in this case, I

15  would respectfully submit that if it is it is marginal at best.

16  And here's why.

17         As to pricing, the pricing here is not pricing that

18  is a closely guarded secret such as exists with unique products

19  such as patented products or products that are sold by a

20  monopolist if you will.

21         This, and based upon Mr. Cohen's own affidavit, this

22  is a highly competitive market.  What economists call perfect

23  competition or close to perfect competition.  And what happens

24  in a market like that with a product that essentially is a

25  commodity, which is what we're talking about here, Michelin

Proceedings                          25

1    tires.  We're not talking about all tires here.  We're talking

2    about pricing for Michelin tires.

3            What happens in a highly competitive market is the

4    consumers are price sensitive.  And pricing is not guarded or

5    kept from consumers.  In fact, and Mr. Videl Erbesh (phonetic)

6    who is one of the vice presidents at Inter City Tire is here

7    today.

8            THE COURT:  Is this the gentlemen --

9            MR. CONNOLLY:  Correct.  To my left, yes.

10           THE COURT:  Okay.

11           MR. CONNOLLY:  mr. Erbesh is prepared to testify if

12   the Court would require that today, that customers frequently

13   call Inter City Tire, and one would assume all of its

14   competitors, to ask pricing on Michelin products.  And they're

15   told that over the phone.  So pricing  --

16           THE COURT:  I believe that.  I mean I have no trouble

17   believing that.  I don't even know that Mr. Brosnick would

18   refute that.  It's simple enough.  I want to know whether I can

19   get a better, you know, deal on tires from you or from Somet,

20   I'm going to call.  But there's much more to it than that.

21   Right?

22           MR. CONNOLLY:  Well as to pricing there really isn't.

23           THE COURT:  What about aggregate data?  In other

24   words, one of the arguments that Mr. Brosnick had raised both

25   in the brief and I think Mr. Cohen addresses this in the

Proceedings                                                                    26

1    declaration, and it came up on Tuesday, is it's one thing to

2    have that isolated data point.  It's a whole other thing to

3    have the aggregate of all of that data from Michelin Tire sales

4    and related product sales over a seven year period.

5          Because then you do start to get insight, don't you?

6    Or at least to be able to draw reasonable inferences about

7    pricing strategy.

8          MR. CONNOLLY:  But the question that I'm getting at,

9    Your Honor, is is the pricing information itself truly a trade

10   secret.  Is it truly only available to the owner of that

11   information?  And the answer here is no, it's not.  And I would

12   cite to the Court a few cases, one of which is I would submit

13   far more on point than the Cytodyne case cited by Somet Tire.

14   And that is ARCO Container Corp., v. Warehouser, which is a

15   Western District of Michigan case.  The citation is 2009, U.S.

16   District Court Lexis 9264.

17         THE COURT:  Is this in your brief?

18         MR. CONNOLLY:  No.

19         THE COURT:  All right.

20         MR. CONNOLLY:  No.  And that talks about cases that

21   are product wise similar to this case.  You can't even tell

22   from the Cytodyne case what the product is or what the market

23   dynamic is, because the opinion doesn't describe that.

24         But in he Warehouser case the court says although

25   price information can be proprietary it may not be confidential

Proceedings                                    27

1   in the least depending on the circumstances.  In a highly

2   competitive market, one which approaches the economist's

3   concept of perfect competition, the price level emerges from

4   the interaction of demand with all firms output decisions.

5   Therefore sellers are price takers with no power to set the

6   price.

7           In such competitive markets there are no secrets

8   about price as buyers and sellers are fully informed about the

9   price and availability of product.  Sellers in a competitive

10  market make no effort to keep their prices secret, but publish

11  price lists or even post their prices for the whole world to

12  see on the internet.

13          By contrast in less competitive markets sellers have

14  more power to influence price.  Such sellers are deemed to have

15  market power defined as a power to control prices or exclude

16  competition.

17          We are, you know, the world is filled with shades of

18  grey, but if one looks at the facts in this case we're talking

19  about a commodity product.  And -- product.  A Michelin tire.

20  And there are consumers who prefer Michelin tires.  It is

21  undisputed Michelin is an elite quality or a high quality tire

22  product.  And there are consumers who want that product.

23          The pricing as to that is made readily available to

24  anybody for making the inquiry.  It's not protected by Inter

25  City, by Somet, or anybody else.  And so under the Warehouser

Proceedings                    28

1    decision I would say that the pricing information itself is, if

2    it's trade secret at all it is not highly guarded, truly

3    confidential, worthy of the type of relief sought here, because

4    it's simply, it's readily available, Your Honor.

5              And add to that --

6              THE COURT:  But what about this?  What about if lets

7    say customer A calls Somet and says how much for these Michelin

8    tires on Monday.  And they say okay, it's X.  And then another

9    person calls the next day or say a week later and makes an

10   inquiry and it's X plus Y.

11             Now the second caller may have no idea what the price

12   was.  They only know what the price quote was for them.  They

13   have no idea what the price quote was for the prior caller.

14   It's the aggregation, isn't it the aggregation of that data

15   that is something that Somet is concerned with?  Or reasonably

16   concerned with.

17             MR. CONNOLLY:  I will accept the notion that it is,

18   Your Honor.  But it is still not confidential.  That

19   information given out on Monday and the information given out

20   on Tuesday is being disseminated into the competitive arena in

21   an unprotected fashion.

22             Add to that, Your Honor, the pricing information here

23   that we're seeking is stale.  It's two years old.

24             THE COURT:  But aren't you -- I'm not sure of that.

25   We'll come back to that in a moment.  That's a separate issue.

Proceedings                                          29

1   But are you saying then that pricing data can never be trade

2   secret information because by definition it's ultimately shared

3   with whoever buys the product?

4          MR. CONNOLLY:  I would say, Your Honor, that there

5   are situations where pricing information is protected as

6   between sellers and buyers.  Highly sensitive situations where

7   that type of commercial arrangement exists.

8          But courts recognize that in cases like this, and I

9   can cite a number of cases which have recognized this, that

10  courts have held that price information freely given to

11  customers is not a trade secret.  I don't think the Court needs

12  to reach a finding here that this is not a trade secret.  But

13  what I want to --

14         THE COURT:  You're going to argue in the balancing

15  test --

16         MR. CONNOLLY:  Exactly.

17         THE COURT:  I got that.  So all right.  So lets

18  transition to --

19         MR. BROSNICK:  Your Honor, if I may address this.

20  Because we covered a lot of ground there.  I think it's going

21  to get lost if we try to cover every nuance and then come back

22  and go through a litany of 30 issues.

23         THE COURT:  Well here's the thing.  I trust that

24  you're going to remember what's important and argue it.  If we

25  go back and forth on every point this is going to end up taking

Proceedings                                    30

1   four times as long.  And we're already an hour in.  So, the

2   only other thing left to really discuss here is relevance in

3   any event.  And then I'll hear from Mr. Brosnick.  So, what is

4   the relevance?

5           MR. CONNOLLY:  Before I get to relevance, and I'll

6   get to that in a moment, the other area of sensitivity is the

7   customer list.  And I simply want to bring to the Court's

8   attention the fact that consumers of truck tires are publicly

9   available, it's a publicly available list of consumers.

10  Because everybody who operates a truck in this country has to

11  get a DOT number.  And the DOT lists the owners and operators

12  of trucks and their DOT number is on a public website.  And

13  there's an industry out there of companies that sell lists of

14  truck operators to entities in the businesses in which Somet

15  and Inter City operates.

16          So the consumers of these products are not secret at

17  all.  They're publicly available entities.

18          THE COURT:  Well you don't know the customer.  You

19  only know a potential customer.

20          MR. CONNOLLY:  Correct.

21          THE COURT:  Okay.

22          MR. CONNOLLY:  Correct.

23          THE COURT:  All right.  So lets talk about relevance.

24  So why -- I understand, I think I understand the relevance of

25  the prices paid for Michelin tires.  A party of your -- if your

Proceedings                                    31

1    theory essentially is they were able to undercut us, the actual

2    price point for the Michelin brand tires, you're going to

3    argue, goes a long way towards proving whether the undercutting

4    took place.  Right?

5              MR. CONNOLLY:  Well it's, it really is secondary to

6    that.  Because what's more important there is the pricing at

7    which Michelin or those acting on behalf of Michelin sold the

8    tire to Service Tire, if that's the initial purchaser, or Somet

9    Tire.  In most of the transactions involving Somet Tire the

10   tires are coming through Service Tire.

11             THE COURT:  Right.  And you already have that

12   information.

13             MR. CONNOLLY:  We already have that information.

14             THE COURT:  That's the upstream information you

15   already have.

16             MR. CONNOLLY:  Right.  So what's important about the

17   price that's charged by Somet to its customers and who those

18   consumers are is Inter City has the burden of showing a causal

19   link between the misconduct here and the harm that it alleges

20   it sustained.

21             And one of the ways in which that can be accomplished

22   is by showing that Somet Tire sold Michelin tires and related

23   services to the very same customer body that Inter City had

24   sold tires to in the past and that Inter City competes with.

25   And the only way to get that information is to get the list of

Proceedings                                    32

1    customers who have actually purchased the diverted tire

2    products.

3            One of the claims in this case, Your Honor, is

4    against Service Tire.  And it's for intentional interference

5    with advantageous relations.  And that is a claim that is based

6    upon the disruption of Inter City's relationship with its

7    customers.  The disruption has resulted from the fact that

8    Service Tire in collusion with Michelin has flooded the market

9    in which Inter City competes with tires that are sold at or

10   below the cost that Inter City had with Michelin.

11           So this evidence is among the most relevant evidence

12   in the case to make that point.

13           THE COURT:  Why do you need the actual customer

14   identities?

15           MR. CONNOLLY:  Because -- well, Your Honor, it's the

16   best evidence of the fact that we've lost customers.  That

17   we've lost sales.

18           THE COURT:  That can't be presumed from the fact that

19   they're selling tires at say 20 percent less than what you're

20   selling them for.

21           MR. CONNOLLY:  Your Honor, I think there can be a

22   presumption drawn from the difference in price.  That's

23   correct.  But there's always questions when one is in trial

24   about evidentiary issues and what's required by a court.  And

25   there's been many arguments made in this case by the lawyers

1    for Service Tire and Michelin that we can't show that we've

2    lost any customers.  That has been a mantra that the court in

3    South Carolina has heard throughout discovery in this case.

4              This the evidence that will show these are our

5    customers.  We have records as to who our customers are.  And

6    we are absolutely certain that we've lost customers to Somet

7    Tire and Service Tire.

8              THE COURT:  Did you ever go and ask any of those

9    customers who did you start to buy tires from?

10             MR. CONNOLLY:  We've done that, Your Honor, as to

11   some customers.

12             THE COURT:  Okay.

13             MR. CONNOLLY:  But we're talking about thousands of

14   customers.  It is not practical for, and the law doesn't

15   require a plaintiff in a case like this involving Robinson-

16   Patman and intentional interference claims to go out and survey

17   the entire universe of tire consumers in order to prove --

18             THE COURT:  No.  But as you said it is your burden to

19   prove loss.  Now why also -- can you also to some degree show

20   that from a decline in sales of the tire by you?

21             MR. CONNOLLY:  Yes.

22             THE COURT:  Okay.

23             MR. CONNOLLY:  That is one of the facts that's

24   relevant to that analysis.

25             THE COURT:  Okay.

Proceedings                                      34

1        MR. CONNOLLY:  There's a constellation of facts.
2   But, Your Honor, I would submit to the Court, respectfully, the
3   best evidence that we lost customers to this diversion scheme
4   is the list of customers that bought the tires, if we can, and
5   we believe we will be able to, connect the dots to the fact
6   that they used to buy tires from Inter City.  They're now
7   buying from Somet.  They're now buying from Service Tire.
8        That is the best evidence.  It is the most germaine
9   evidence to respond to the arguments that the lawyers for
10  Service Tire and Michelin have been making throughout this
11  litigation and no doubt will make throughout the trial staring
12  in February.
13       THE COURT:  All right.  Mr. Brosnick, you've been
14  very patient.  Go ahead.
15       MR. BROSNICK:  Thank you, Your Honor.  Let me, I
16  guess we do have a litany of things to address.  But let me
17  start by pointing out an inconsistency.  Well let me start by
18  pointing out that Mr. Connolly suggested to the Court that the
19  most granular possible pricing information, not just by
20  customer, but by customer, by transaction, by product and
21  quantity is not a trade secret.
22       I would submit to Your Honor having addressed this
23  issue before the U.S. Department of Justice and numerous
24  courts, that is the most sensitive pricing data that any
25  business has.  So contrary to what Mr. Connolly told you, and

Proceedings                                        35

1     it's not, if there is a range, and I don't disagree there is a

2     range of sensitivity in trade secrets, this is at the bright

3     red most sensitive part.  Perhaps only with the actual secret

4     formula of Coke to the other side of it.

5            I would also like to point out an inconsistency.  Mr.

6     Connolly persuaded Your Honor to force Somet and Mr. Cohen to

7     divulge his percentage of the ownership by claiming that

8     Michelin's pricing in 2003 and '04 and '05 was relevant and

9     important to their case taking place in 2015.  But now he's

10    standing up and saying Somet's pricing in 2008, '09, '10, '11,

11    '12, and '13, oh, that's stale.  It's irrelevant.

12           Mr. Cohen's testimony is undisputed in the record

13    before Your Honor.  Pricing as recently as 2012 and '13 is

14    absolutely competitively relevant.  And the pattern of

15    prices --

16           THE COURT:  I'm sorry.  Wait.  Say that again.

17    Pricing from when?

18           MR. BROSNICK:  The pricing at least from the last few

19    years, from 2011, I believe Mr. Cohen testified from '11, '12,

20    and '13 is still competitively relevant.  And if you look at

21    the pattern and changes in pricing over a period of time,

22    perhaps not from mid-2006 to the end of 2006, perhaps that's

23    actually stale, although Mr. Connolly disagreed that that was

24    stale, does he argue to Your Honor that Michelin's pricing from

25    even older is still relevant because Mr. Cohen knows about from

```
                        Proceedings                        36
```

1    2004.

2            THE COURT:  I'm not sure that I buy that correlation.

3    But in any event --

4            MR. BROSNICK:  But in any event, my point is that

5    pricing data is absolutely the most relevant.  And it's not

6    just pricing data.  If we were talking, I agree with what Your

7    Honor was saying, if we were talking about the average price of

8    a Michelin tire sold in 2012, that would be, I'd have to take

9    that back to my client, to, Judge, exactly how, Mr. Cohen is

10   not here.  I can't ask him how relevant would that be.  Or how

11   sensitive would that be.

12           But now we're talking, Your Honor, used one example

13   of a customer who calls on Monday and another customer calls

14   the next week.  I'll take that -- that's absolutely correct and

15   I'll take that example two steps further.

16           Two customers call on the same day.  But one of them

17   is buying more tires or one of them buys more often, or one of

18   them is a bigger customer and gets a different price.  Or the

19   next customer is also buying other products and gets different

20   pricing.

21           The trick that Mr. Connolly tried to pull in saying

22   Michelin tire is a commodity is he ignored the premise, I don't

23   want to get too economically complicated here, but --

24           THE COURT:  Please don't.

25           MR. BROSNICK:  -- he ignored what's called a

1   differentiated pricing.  If I'm going to Walmart and buying a

2   thing off the shelf where it costs $10 to me, it costs $10 to

3   you, it costs $10 to Mr. Connolly, everybody, then at least

4   there's an argument to be had that everyone knows what that

5   cost is.

6           And the case Mr. Connolly cited, which wasn't cited

7   in his papers so I did not -- read, he said talked about

8   published price lists.  And I would agree.  If there is a price

9   list on the internet then --

10          THE COURT:  If there were prices on the internet this

11  wouldn't be in front of me for an issue --

12          MR. BROSNICK:  Exactly.

13          THE COURT:  -- because it would be a publicly

14  available right.

15          MR. BROSNICK:  Exactly.  What the issue here is the

16  differentiated pricing.  Is the idea that every customer gets a

17  different price.  And I would point Your Honor to the citation

18  of My Systems Corp., v. Peak Computer Industries, from the

19  Ninth Circuit that is cited at page 18 of our brief.  And I'll

20  quote, well proofs --

21          THE COURT:  I read it.

22          MR. BROSNICK:  I'll quote it.  It says, --

23  information "allows a competitor to direct its sales efforts to

24  those potential customers" that are already in that market for

25  the specific product.

Proceedings                                                38

1        Michelin tires, first of all I don't accept the idea

2   that Michelin tires are a commodity.  And obviously I think

3   people go to Michelin it's the opposite of a commodity.

4   Michelin tires are a brand that draw people in.  But even that,

5   Michelin tires are not themselves one product.  It is an array

6   of models, some customers have demand for particular models,

7   some what the highest model, some want to buy other things.

8   The pricing, if the pricing were generic we wouldn't be here.

9   The pricing is as individual and granular, and that is

10  precisely why it is so sensitive.

11       Let me say further, let me further I just addressed

12  pricing.  Most of the cases that talk about this area of the

13  law, most of the cases cited in Somet's briefing, address

14  customer lists and rule that customer lists are trade secrets

15  and can't be produced.

16       I want to impress on the Court how much more than

17  customer lists we're talking about.  We're talking about not

18  just the customers -- we're talking about the customer, what it

19  bought, on specific dates, in what quantities, at what prices,

20  at a transactional level.  You can not get more granular than

21  that.  And I would argue that just the customer list is a trade

22  secret and not I am, almost every court that's ever addressed

23  this.

24       This issue as to sensitivity is the Cytodyne case.

25  And this will allow me to transition to relevance.

Proceedings                                    39

1          In the Cytodyne case the party seeking discovery made

2     the precise argument that Mr. Connolly and Inter City are

3     making today.  It was a Robinson-Patman case that they needed

4     the pricing information from their competitor in order to show

5     that they had lost customers and were being undercut in the

6     market.  Exactly.

7          The motion was quashed.  There was no compromise.

8     There was no, oh, I'll force you to produce this much of your

9     trade secrets.  There was no compromise.  The subpoena was

10    quashed because there had been no proof of lost customers

11    listed.

12         I would submit, I would still be making many of these

13    same arguments, but I would be in a more difficult position if

14    the subpoena had shown that Inter City had lost these six, or

15    these nine, or these 14 customers and had reason to believe

16    that they were buying from Somet.

17         Mr. Connolly has already told you that who buys, it's

18    a public market.  People, it's fairly transparent.  People

19    know.  You can see where trucks go.  Though not with what

20    frequency.  But if we were talking about more granular, if

21    Inter City had made a representation, put proof before the

22    Court that we've lost customers A, B, C, and D.  And certainly

23    they have the records.  They know who their customers were in

24    2008 and they could probably see well those customers didn't

25    buy from us in 2009, '10, and '11.  They might be --

Proceedings                                          40

1      THE COURT:  Yeah.  But I mean you can understand why

2  if you were in his position you would want something that

3  suggests more of a direct correlation than that.  Right?  Other

4  than this they were here one day and gone the next.

5      MR. BROSNICK:  I would, if I were in his position I

6  wouldn't want to go on a fishing expedition and I certainly

7  wouldn't expect the Court to ask my competitor to produce --

8  because I don't want to identify customers.  I have a party who

9  has an interest in this don't want to identify any of my

10  information.  You need to identify literally every piece of

11  information.  And that's really the relevance issue.

12      The broad theory of relevance, the idea that a

13  competitor of sales or a competitor of products, I'll concede

14  that.  On a Robinson-Patman claim broad theory pricing can be

15  relevant which is why Your Honor's idea of aggregate annual

16  data I do want to take that back to my client.  That's

17  something to consider if Your Honor wants to go there.

18      But the idea of -- the Cytodyne case, the reason I

19  cited it even though it's in Florida, well it was a New Jersey

20  underlying case, is precisely this case.  The discovery party

21  asked, offered the same information and the subpoena was

22  quashed precisely because it had not offered proof of lost

23  customers or even that market share was offered to that

24  customer.

25      I would also direct, I know none of this was

Proceedings                                        41

1    addressed.  I would also highlight the <u>PPL Energy Plus</u> case

2    where it -- give me a minute, Your Honor.  I think the quote is

3    worth hearing.  I'm reading from the court's opinion, this

4    Court's opinion, this is from New Jersey.  Here the subpoena

5    would effectively require the participants to disclose

6    confidential proprietary business information to the

7    competitors.  This fact alone presents significant hardships,

8    especially in light of the participant's non-party status.

9         And then that court went even further to the point

10   that I think is also germaine here and has not been addressed,

11   the harm to the market that would occur.

12        If Somet is crippled here, if Somet's pricing

13   information goes out, if Inter City learns -- in order to get

14   business from X, Y, Z trucking, I only need to beat this price.

15   Or I know that they -- I only need to offer them a discount on

16   this ancillary product and not the other one.

17        The customer, Somet will be demolished.  So in that

18   sense the market will be harmed because there will be less

19   competition out there overall.  But even the particular

20   customers will be harmed because Inter City will have learned

21   the particular deal that was negotiated with Inter City.

22        THE COURT:  Wait, I'm sorry.

23        MR. BROSNICK:  Inter City will have learned the

24   particular deal that was negotiated on each occasion with

25   Somet.

Proceedings                                42

1          THE COURT:  With each customer.

2          MR. BROSNICK:  With Somet.

3          THE COURT:  Right.

4          MR. BROSNICK:  And then Inter City will say --

5          THE COURT:  Wait.  Well one of the deals that was

6   negotiated between Somet and particular customers.

7          MR. BROSNICK:  Right.

8          THE COURT:  Right.

9          MR. BROSNICK:  So Inter City will have learned, and

10  this is what Your Honor is --

11         THE COURT:  Yeah, the PPL case discusses it.

12         MR. BROSNICK:  Yeah, this is what Your Honor's

13  colleague was referencing.  That Inter City will have learned I

14  don't need to go below that price.  This is the limit of where

15  I need to go.

16         THE COURT:  All right.  But this practically doesn't

17  scream for Mr. Connolly, at least up until a certain point, to

18  say that it's purely historical and how does that information

19  give Inter City any sort of unfair competitive market advantage

20  in 2015?

21         MR. BROSNICK:  Your Honor, I mean one I would go back

22  to Mr. Cohen's testimony and say that --

23         THE COURT:  It hasn't changed much.  Okay.

24         MR. BROSNICK:  Looking at the pricing information

25  from recent years does absolutely give information and insight

Proceedings                                                        43

1    because --

2              THE COURT:  Well what about '06, '07, '08?

3              MR. BROSNICK:  Well '06 isn't relevant because --

4              THE COURT:  Okay.  '07 after Mr. Cohen arrives at --

5              MR. BROSNICK:  Right.  So '07 itself I would probably

6    concede is not that relevant.  But what we're talking about and

7    to address one point Mr. Connolly raised, although I'd be happy

8    with a spreadsheet, this kind of crosses over to expense

9    burden, Somet being a small company with only two employees in

10   charge of records, and not like, you know, other huge companies

11   that maintain records back in time, they only have computer

12   records back approximately two years.  They go back to some

13   point in, I forget, it's either late 2012 or early 2013.

14             So they don't have computer records going back.  They

15   would be talking about having to go back and either produce

16   volumes, thousands and thousands of invoices which would also

17   contain a lot of other information.  You know, customers,

18   addresses, all that other particular information, unless they

19   wanted to pay me tens of thousands of dollars more to redact

20   all of that.

21             But also it would not be possible to produce that.

22   It would not possible without a huge amount of expense to

23   recreate it, so as to produce that in an aggregated summarized

24   form.  And the only period of time for which Somet could

25   produce aggregated information without huge expense and effort

1    burden would be the most sensitive period, you know, the last

2    two, two and a half years.

3            THE COURT:  Which would be what?  2012?

4            MR. BROSNICK:  I could find, I could call and find

5    the exact date.  I just don't recall as I stand here today.

6    But it's in our brief because, it's my affidavit actually

7    because Inter City's papers accused Somet of not, of violating

8    the subpoena and not producing electronic form when it had been

9    requested.

10           And I specifically had that discussion with Mr.

11   Connolly's partner and explained.  And in October I did know

12   the exact month that the electronic records went back to.  And

13   I asked her, do you want the electronic records or do you want

14   us to draw all the paper.  We don't want to do both, that would

15   be an undue burden.  She elected paper.  And that's why we

16   produced the paper.

17           THE COURT:  All right.

18           MR. BROSNICK:  For the upstream information.  But I

19   believe I've covered, I'm prepared to address any of Your

20   Honor's, I think the final point I'll make is that on relevance

21   if there's going to be a burden of which party needed to go

22   into its records and substantiate something, I would urge Your

23   Honor to reach the same decision as the Cytodyne case did.

24           It's the burden of issuing a particular live subpoena

25   for the information that was needed, especially here at the eve

Proceedings                                                45

1    of trial where everything else has to be known.

2         If Mr. Connolly referenced that Service Tire is the

3    one in the alleged diversion scheme, I don't know what the

4    numbers are.  I can't say whether it would have been an undue

5    burden anyway.  But my argument here today would be different

6    if the subpoena had been here's a record of what tires were

7    diverted.  We have evidence they were diverted.

8         And we also can show what period of time my customers

9    have  been lost.  And so we're seeking this line item, this

10   customer, this batch of tires, serial numbers X, Y, Z that we

11   got discovery from Michelin or Service Tire or one of the other

12   parties.

13        That would be at least a different argument to have.

14   And I respectfully submit that the difference between that and

15   this is why the phrase fishing expedition was introduced into

16   the law.

17        THE COURT:  What about -- so the aggregation, because

18   frankly I have been considering at least some of the aggregate

19   data approach.  For the period of say 2007 to 2010 or 2011,

20   you're saying that's not possible.  Right?

21        MR. BROSNICK:  It's only possible if someone like me

22   or an associate of mine spends a hundred hours going through

23   reams of invoices and physically doing it.  And I would submit

24   that that -- we've been talking all morning about the burden

25   from a competitive standpoint, which is the primary issue.

Proceedings                                                46

1          THE COURT:  I understand there's a production burden

2     and it's under Rule 26.  But, and for that matter Rule 45 and

3     case law interpreting Rule 45 do allow the Court to shift costs

4     if necessary.  Essentially to honor the requirement under Rule

5     45(C)(2)(b)(ii) as is noted in the advisory committee notes

6     that a non-party required to produce documents and materials is

7     protected against significant expense resulting from

8     involuntary assistance of the court.

9          This provision applies, for example, to a non-party

10    required to provide a list of class members.  A court is not

11    required to affix the cost in advance of production.  But it

12    may be -- on certain costs to be determined until after.

13         Why can't I require, if Mr. Connolly and Inter City

14    really wants this data, to pay the costs of its production?

15         MR. BROSNICK:  With respect to the cost of my

16    associate aggregating the reams of invoices I agree.  That

17    would resolve the expense burden.

18         The other half of the production burden is telling

19    the two employees who do records at Somet that you have to go

20    back into your records for now the fourth time and gather all

21    this stuff and segregate it, and get it to me and then spend

22    time on the phone with my associate going back and forth with

23    questions.

24         That part, I mean I suppose we could ascribe an

25    hourly rate for financial to compensate them.  But they

Proceedings                    47

1   wouldn't be doing their job.  I mean Somet actually is a

2   business and these people are on the phone with customers, are

3   pulling invoices to do -- they're also customer

4   service/records.  So it would be a material burden just that

5   aspect to them.

6           But the expense side of it I agree with Your Honor.

7   If I could send my firm's bill and the hourly cost allocated to

8   the hours that Somet's people took to gather the records as to

9   the expense side at least, and not the occupying employees

10  side, would be resolved.

11          THE COURT:  All right.  We're going to take -- we've

12  been going for an hour and a half.  We're going to take a five

13  minute break and then I'm going to come back.  We're going to

14  rule on this and then we're going to talk about the bank

15  subpoenas.

16          MR. BROSNICK:  Thank you, Your Honor.

17          MR. CONNOLLY:  Your Honor, I have a couple of points

18  I'd like to respond to.

19          THE COURT:  Very quickly, Mr. Connolly because --

20  this is, look, lets be clear about this.  This has been

21  exhaustively briefed.  I have read, as I think you've seen, the

22  papers rather thoroughly.  We had a hearing on Tuesday, which I

23  understand was truncated because of some other matters and the

24  need to leave early.  And we've already been going on this one

25  issue an hour and a half.  We still have the bank subpoenas and

Proceedings                                                 48

1    we still have the 30(B)(6).  So unless you're prepared to stay

2    here until Monday we need to, you know, address each item and

3    move on.

4              So if you've got something to tell me fine.  But it's

5    got to be brief because obviously I'm going to have to allow

6    Mr. Brosnick to respond if he wants.

7              MR. CONNOLLY:  The one factor that I didn't mention

8    initially, Your Honor, it's the reason I gave the documents to

9    the Court, is that in balancing all of the factors that the

10   Court should take into account in evaluating harm versus

11   burden.

12             The Court, I respectfully submit, should look at the

13   fact that the documentation previously produced, and I'll cite

14   as an example the document with the bates number Somet 0082,

15   shows --

16             THE COURT:  082?

17             MR. CONNOLLY:  0082.

18             THE COURT:  Yeah, okay.

19             MR. CONNOLLY:  That's a Service Tire invoice that the

20   Court can see under the ship to says it's to Lafarge North

21   America, which has been scratched out and the word Somet is

22   written in there.

23             THE COURT:  Right.

24             MR. CONNOLLY:  And that's one of numerous examples of

25   invoices which show, and this is why Mr. Cohen's knowledge from

Proceedings                                    49

1    working at Inter City Tire is so relevant, that shows that Mr.

2    Cohen knows that he is buying national account tires.  He's not

3    buying tires that Service Tire got through the ordinary

4    channels at Service Tire.  And in fact that is conceded in

5    emails which I could also cite to the Court that were produced

6    by Somet Tire.

7            Somet Tire acknowledges that they are producing

8    national account tires.  In fact let me draw the Court's

9    attention to one more document.  Somet 02575.

10           THE COURT:  Wait.  Okay.  Got it.

11           MR. CONNOLLY:  So that's an email from Marsha Oliveri

12   (phonetic), an employee of Somet Tire to Mike Gavin of Service

13   Tire.  And she says, Mike, regarding a particular Michelin tire

14   model we can't put these tires through national account

15   anymore?

16           Somet Tire, Your Honor, because Mr. Cohen worked at

17   Inter City, they know this is an illegal fraudulent diversion

18   scheme.  And they're taking advantage of it.  This is exactly

19   the language that reflects the fact that Somet Tire knows

20   they're getting diverted national account tires.

21           So that level of complicity in a fraudulent scheme I

22   respectfully submit should be taken into account by the Court

23   when considering the burden and the other arguments made by Mr.

24   Brosnick.

25           THE COURT:  All right.  Fair enough.

Proceedings                                    50

1          MR. BROSNICK:  If I may just for a moment.  I agree

2     with Your Honor it's been a long morning.  This goes back to --

3     there are two responses.  One, it doesn't actually show what

4     Mr. Cohen just said.  It shows that Somet knew it was getting a

5     deal.  It does not show that Somet was involved in any scheme

6     or knew that it wasn't supposed to be involved in getting a

7     national account.

8          THE COURT:  No.  But what it does tend to show, at

9     least as to the second of the two, is at least an expectation

10    that Michelin Tires are being billed through the national

11    account.  And that's the second tier pricing.  Right?

12         MR. BROSNICK:  That I concede.  It does show that.

13    But it doesn't show that Ms. Oliveri knew that that was

14    something you couldn't get.  And I will submit to Your Honor's

15    consumer.  When you go somewhere and someone offers you a

16    discount how often do you question, wait a minute, am I really

17    entitled to that discount.  Don't give me that discount.

18         How often do you really question a vendor to say --

19    if I'm going to buy a new car and the car salesman says we have

20    a special deal because we're being sponsored by Ford today.  Do

21    you say wait a minute.  I live in X county.  Am I entitled to

22    that discount?  Let me pay more.

23         I submit that Somet does not do that either.  But

24    more importantly than that, and really I think the broader

25    point that goes to -- Mr. Connolly has highlighted two

Proceedings                    51

1    documents.  And he could probably highlight half a dozen or

2    maybe even a dozen documents that arguably raise some kind of a

3    potential inference.

4           THE COURT:  Let me step back a bit.  You were talking

5    about the discount issue.  Lets say, for example, I went to go

6    buy a car and the car dealer says you know what, we've got a

7    great deal for you.  We've got the recent college graduate

8    deal.  Okay.  And you can save, you know, 25 percent.

9           As much as I'd like to fancy myself young enough to

10   have recently graduated, you know if there's -- the idea of

11   essentially saying well okay, I'll overlook that so I get  the

12   better deal, I don't know that I necessary agree with your

13   premise.

14          MR. BROSNICK:  They're really two responses to that.

15   One is that Somet was, or you would be under no duty to the car

16   dealer to disclose when you graduated college.  And you

17   wouldn't be violating any law or duty to not do that.

18          THE COURT:  Okay.

19          MR. BROSNICK:  But two, and I think more importantly,

20   it is objectively obvious well you may have gone to college

21   later in life --

22          THE COURT:  No, you could say it.  It's objectively

23   obvious.

24          MR. BROSNICK:  -- whereas it is not objectively

25   obvious that national account discounts are not available on

```
                        Proceedings                          52
```

1    the second level.

2            THE COURT:  Okay.

3            MR. BROSNICK:  Now maybe, I know Mr. Connolly has

4    represented that from a decade ago Mr. Cohen had some

5    information.  I don't know whether Ms. Oliveri would have that

6    information.  But in any event that is beside the point of what

7    we're discussing this morning because it's entirely possible

8    that whatever information Somet has, if it has any, came from

9    Service Tire.  Came from its actual dealer.  Who knows?  No

10   discovery has been taken on that.  And Inter City has put

11   nothing before the Court.

12           But I think the more important point, the broader

13   point I really wanted to make, is if you look at these two or

14   half a dozen, or even dozen documents, it comes back to the

15   difference between a fishing expedition and targeted proper

16   discovery to a non-party.

17           We would be having a different argument if Mr.

18   Connolly had issued a subpoena during the discovery period

19   saying we produced these records that he chose from here.  We

20   produced these records on November 10th.  I believe.  In early

21   November.  If Mr. Connolly -- and they issued -- if they had

22   issued another subpoena on November 17th and November 20th, or

23   on December 2nd, asking for further documentation regarding

24   these specific transactions, I would have a more difficult

25   argument here this morning.  They didn't do that.

Proceedings                                    53

1        And they stood on their request number two and

2  foreshadowing what we'll discuss after the break, they issued

3  an even broader fishing expedition in the 30(B)(6).

4        THE COURT:  Yeah.  Here's what we're going to do.

5  We're going to take a break now.  I'm going to come back.  I'm

6  going to rule.  Then we're going to deal with the bank

7  subpoenas and then we're going to deal with the 30(B)(6).

8  Because I can't help but wonder at the end of the day if

9  rulings on these other things may help clarify where you folks

10  are going to go and not go in the 30(B)(6).  If it goes

11  forward.

12        All right.  So it is 11:35.  We'll resume in ten

13  minutes.

14        MR. BROSNICK:  Thank you, Your Honor.

15        MR. CONNOLLY:  Thank you, Your Honor.

16        (Ten minute recess.)

17        MR. BROSNICK:  I confirmed two factual things that

18  came up during the morning session.

19        THE COURT:  Okay.

20        MR. BROSNICK:  First is that I was correct that

21  Somet's computer system maintains active -- it only has a two

22  year capacity.  Because of the subpoena they have records back

23  into 2012.  But in the normal course they would only now have

24  2013 and '14.

25        And I spoke to one of the two records employees about

Proceedings                                      54

1    what would be involved in you going to gather all Michelin

2    invoices from 2007 to '10.  She was flummoxed.  The idea she

3    said we'd have to out to the warehouse through dozens and

4    dozens of boxes and spend days shifting through to try to

5    figure out what to send you.

6              THE COURT:  For what period of time?

7              MR. BROSNICK:  Your Honor had referenced 2007 to '10.

8              THE COURT:  Yeah.

9              MR. BROSNICK:  Which is why that's what I asked her

10   about.

11             THE COURT:  Yeah.

12             MR. BROSNICK:  It would be, well the point that Your

13   Honor made this morning that I agreed with was that the expense

14   portion of the burden could be addressed, the cost shifting.

15             THE COURT:  Right.

16             MR. BROSNICK:  The effort part of the burden

17   obviously couldn't be.

18             THE COURT:  All right.  What would be entailed, Mr.

19   Brosnick, in for the 2007 to 2010 documents in acquiring

20   pricing only information?  I know that's clearly not what Inter

21   City wants.  I'll address that in a moment.  I'm just trying to

22   get an understanding as to those, for those records how at

23   least some of that data would be provided and what would be

24   entailed in that.  Given that -- keeping in mind that you folks

25   are going to trial next month too.

Proceedings                                              55

1        MR. BROSNICK:  If we're talking about pricing of all

2   Michelin tires by model, that were sold in those years, we'd be

3   talking about only one of the two employees could be devoted to

4   the task because the other one would actually have to work

5   doing Somet's jobs.

6        THE COURT:  Sure.

7        MR. BROSNICK:  We'd be talking about one employee

8   going into the back part of their facility where there are

9   dozens, if not hundreds of boxes.  Figuring out which boxes

10  have relevant invoices from Michelin -- invoices are organized

11  by customer not by product sold.  So if someone bought a

12  Michelin invoice that could be in the folder right next to

13  where they bought another type of tire or got servicing.

14        It would involve someone spending days, if not weeks,

15  going through all those boxes.  Organize and segregating out

16  the records that deal with this.  And then giving them, then

17  shipping them to my firm and then my associate who was here the

18  other day and probably another one spending a lot of time going

19  through and pulling off the price information to create

20  spreadsheets.  I suppose a paralegal could help with that as

21  well.

22        THE COURT:  Uh-huh.

23        MR. BROSNICK:  But it would be a dramatic

24  undertaking.  And that, Your Honor, just to be clear, only

25  addresses the Michelin tires.  It would be a exponential amount

Proceedings                                           56

1   of financial.  It would be three, four, maybe ten times more to

2   also cover products that were purchased with each Michelin

3   tire.

4          THE COURT:  I understand.  Mr. Connolly, what am I

5   supposed to do with that?  I mean it can't simply be make them

6   produce it because logistically it sounds to me that under the

7   best of circumstances that may be unreasonable.  And given the

8   trial date that is really a problem, to put it mildly.

9          MR. CONNOLLY:  May I have a moment to confer with my

10  client, Your Honor?

11         THE COURT:  Take all the time you need.

12         (Brief pause.)

13         MR. CONNOLLY:  Your Honor, what I would like to

14  propose is that Inter City pay the cost of having temporary

15  workers visit the Somet Tire document warehouse and under the

16  supervision of a Somet Tire employee review the records and

17  record and copy to the extent necessary the documents that are

18  pertinent during the period of time that the Court allows.

19         And that way the work is, there's no burden beyond

20  the supervisory component on Somet Tires resources.  We pay the

21  cost of the reviewers.  And respectfully I don't think we need

22  a law firm to review any of this.  We're talking about getting

23  customer names and pricing.  There doesn't seem to me to be a

24  need for a lawyer to review this.  It's simply a ministerial

25  job of recording information and copying documents.

Proceedings                                    57

1        And obviously anything that we record and copy we
2   would share with Somet Tire and the parties in the South
3   Carolina litigation.
4        MR. BROSNICK:  Your Honor, first I certainly hope
5   that dealing with customers' names and pricing --
6        THE COURT:  Well putting that aside.  What about the
7   idea of --
8        MR. BROSNICK:  -- as an antitrust lawyer I would
9   submit that it is --
10       THE COURT:  I understand that.  What about though Mr.
11  Connolly's idea of having some essentially third party document
12  custodian just review the documents to cull out the relevant
13  and material that Inter City would pay for.
14       MR. BROSNICK:  There are really two responses.
15  First, it would materially reduce the burden because as Mr.
16  Connolly pointed out the same one of the two employees would
17  have to be there supervising the whole time.  So the actual
18  work she needs to be doing wouldn't be as onerous.
19       THE COURT:  Right.  Presumably though with multiple
20  hands on deck culling it would go quicker.  Wouldn't it?
21       MR. BROSNICK:  It would go quicker with multiple
22  hands.  But that's assuming that someone who does not know
23  Somet's records at all could do this independently.  I think as
24  a practical matter it would take someone who knows Somet's
25  filing system and who knows who the customers are and knows

```
                          Proceedings                    58
```

1    where records have gone and how it's done, and to be constantly

2    on call.

3              I would concede that it would go faster to have more

4    people, that person supervising three, four, ten, other people.

5    But it would be a tremendous imposition.  A, it would still

6    fully occupy that one person for whatever length of time.  But

7    B, it would be a tremendous imposition to have third party

8    individuals coming in, direct, who weren't under Somet's

9    control, going through records directly -- and then if I

10   understood Mr. Connolly correctly, giving records directly to

11   Inter City.

12             THE COURT:  Well that's his proposal.

13             MR. BROSNICK:  Yeah.  So if, in a litigation sense,

14   if the proposal is culling things out that are then reviewed by

15   the Somet people and potentially by me, then we're talking --

16   would it reduce the effort and expense?  Yes.  Would it reduce

17   it to a level that it would take less than a few weeks to

18   accomplish and be -- at some point it's almost like asking if I

19   shoot you six times instead of 12 times is that going to kill

20   you less.  I'll have fewer holes in me, but I'm going to be

21   dead.

22             THE COURT:  All right.  Let me provide some

23   background because I do think this also may help to some degree

24   with the other rulings.  I've carefully considered the parties'

25   arguments with respect to this issue.

Proceedings                                         59

1        Certainly under Rule 26 relevant information for

2   discovery purposes need not be admissible at trial if the

3   discovery appears reasonable calculated to lead to the

4   discovery of admissible evidence.

5        It's a little bit different here where we are at the

6   very end stage of fact discovery.  And it's not necessarily

7   accurate to say that the discovery will lead to additional

8   discovery since the only open items are these particular

9   subpoenas.

10        But be that as it may, the purpose of discovery, of

11   course, is to uncover facts about the claims and defenses set

12   forth in pleadings.  And therefore the boundaries of relevance

13   under Rule 26 depend on the context of each action.  See,

14   Selmone v. Carter Retail, 2011 West law 1458063 at page two,

15   District of New Jersey April 14, 2011.  The determination of

16   relevance is within this Court's discretion.  Id., at page two.

17        Generally courts do construe Rule 26 "broadly to

18   encompass any matter that bears on or that could reasonable

19   lead to other matters thereon, any issue that is or may be in

20   the case".  Oppenheimer Fund v. Sanders, 437 U.S. 340 at 351,

21   1978.

22        However, Rule 26 makes clear that "the trial court

23   retains broad discretion to determine that a discovery request

24   is too broad and oppressive".  See, Schneck v. IBM, 1993 West

25   law 765638, at page two, District of New Jersey, July 27, 1993,

Proceedings                                                    60

1    quoting Marshall v. Westinghouse, 576 F.2d 588 at 591, Fifth

2    Circuit, 1978.

3            With respect to the current dispute regarding item

4    number two of the subpoena, of course the Court has to consider

5    whether it constitutes trade secret information.  That is

6    particularly a sensitive fact considering that it's beyond

7    dispute that ICT -- well Inter City and Somet are direct

8    competitors in the truck tire sales market.

9            As the court in the Cytodyne Technologies case, 216

10   FRD 533, Middle District of Florida, 2003, instructed, the

11   analysis of whether a party must disclose trade secret

12   information is a multi-step analysis.  Number one, does the

13   material constitute a trade secret?  Two, would disclosure of

14   that material harm the producing party?  And I would note as

15   the Cytodyne court did, that a court may presume harm if the

16   disclosure is to a direct competitor.  But that's a rebuttal

17   presumption.  And then three, does the need for the discovery

18   outweigh the harm caused by the disclosure?

19           In New Jersey trade secret information is defined

20   according to the Restatement of Torts.  That provides, "a trade

21   secret may consist of any formula, pattern, device, or

22   compilation of information which is used in one's business and

23   which gives him an opportunity to obtain an advantage over

24   competitors who do not know or use it."  See, Rohm and Haas

25   Company v. ADCO Chemical, 689 F.2d 424, 431, Third Circuit

```
                          Proceedings                        61
```

1   1982, <u>citing</u> the <u>Restatement of Torts</u>, Section 757, and comment

2   B.  <u>See, also</u>, <u>P.C. of Yonkers v. Celebrations</u>, 2007 West law

3   708978 at page ten, District of New Jersey, March 5, 2007.

4   Quoting <u>Rohm and Haas</u>, 689 <u>F.2d</u> at 431.

5         As the district court noted in <u>P.C. of Yonkers</u>, "a

6   trade secret is information which is the secret of a particular

7   employer and not a matter of general knowledge in the

8   industry."  <u>P.C. of Yonkers</u>, 2007 West law 708978 at page ten.

9         In <u>P.C. of Yonkers</u>, the district court concluded that

10  the plaintiff company's revenue, customer data, and sales data

11  constituted trade secret information because one, it was

12  compiled in the course of plaintiff's business for the use of

13  plaintiff's business; and, two, plaintiff collected the data

14  for its exclusive use and did not generally disseminate it to

15  the public.  <u>See</u>, <u>Id</u>., at page 11.

16        The court in <u>P.C. of Yonkers</u> pointed to several other

17  cases that have held that customer data bases can constitute

18  trade secret information where one, the owner of that

19  information took reasonable steps to protect its secrecy; and,

20  two, the competitor can use that information to its direct

21  economic advantage or to the disadvantage of the owner of that

22  information.  <u>See</u>, <u>Id</u>., at 11.  <u>Citing</u>, <u>MAI Systems v. Peak</u>

23  <u>Computer</u>, 991 <u>F.2d</u> 511 at 521, Ninth Circuit 1993.  <u>See, also</u>,

24  <u>Apollo Technologies v. Centrosphere Industries</u>, 805 <u>F.Supp.</u>

25  1157, 1204, District of New Jersey 1992, where in the court

Proceedings                                             62

stated, "in appropriate circumstances information on pricing, discounts, and other relevant customer data may enable an agent to take unfair advantage of its principal and therefore constitute protectable trade secrets."

In this case Inter City seeks with respect to item number two, one, customers who purchased Michelin tires from STTC for the period of, as discussed during the argument, approximately 2007 when Mr. Cohen arrived there from Inter City until the period of April, end of April 2013. Two, the prices paid by Service Tire customers for Michelin tires according to the exact model, including the exact model of tire, Michelin tire being sold.

And, three, because Inter City argues they lost customers as a result of the Michelin brand tire price cutting, it also wants to know what other services were sold to customers who had also purchased Michelin brand tires. They want to know the quantities, the pricing, and the model.

Now the first issue is whether this material constitutes a trade secret. And as oral argument bore out the parties have different views on this. I find based on the record, the parties' arguments, that the material does in the aggregate constitute trade secret information. Certainly Mr. Connolly's argument is well taken insofar as an individual quote. For example, as we discussed during the argument a customer calling and finding out from Somet what a set of four

1   Michelin brand tires and a particular model will cost on a

2   particular day.  That data point by itself is not necessary a

3   protectable trade secret because it's shared with that

4   individual.

5          But it's a whole other matter entirely to say that

6   the aggregate of that, the movement of prices, the very prices

7   given to different customers according to quantity bought,

8   according to when they bought, and perhaps other things that

9   they've purchased, that the aggregate of that has been publicly

10  released just because in each individual transaction that

11  matter was known by both Somet and the customer.

12         As Mr. Brosnick noted during the argument this isn't

13  a situation where one could easily go on Somet's, a Somet

14  website and see the exact price per tire, per Michelin brand

15  tire on each and every day.

16         Were this information publicly disseminated in that

17  manner the Court may reach a very different result.  It also

18  may be the case that this matter wouldn't even be before the

19  Court.

20         But I cannot find that the aggregate of this data

21  over a approximately six year span with individual price points

22  per tire per customer, to hold that that is not trade secret

23  information because the individual customers knew that data.

24  That to me clearly is at the heartland of trade secret

25  information.  To hold otherwise would essentially say that that

Proceedings                                      64

1   sort of customer data could never be trade secret information

2   because the customer always knows presumably what they're

3   buying and at what price.

4        When I consider also whether the record demonstrates

5   that Somet has reasonably expected that this information would

6   remain confidential, I find that they do.  For example, the

7   Cohen affidavit at paragraph ten states that the "identities of

8   Somet's customers, the specific products and services they

9   choose to purchase from Somet, and which customer purchases

10  which products and services, and Somet's pricing to customers

11  and pricing strategies for particular products and services are

12  not generally known to anyone outside of Somet.  Indeed Somet

13  instructs its employees not to reveal such competitively

14  sensitive trade secrets to anyone outside of Somet and

15  restricts access to its computer and other files to employees

16  who need such information as part of the performance of their

17  duties for Somet."

18       Similarly Mr. Cohen notes in paragraph 13 of his

19  affidavit that the competitive harm is magnified "by the fact

20  that Inter City subpoenas seek such pricing information not

21  just in the aggregate but also by customer, product, product

22  type, and market segment".

23       Because in part Inter City looks for that information

24  on both the micro and the macro level, it is my conclusion that

25  that information in terms of the customer lists and the much

Proceedings                                                65

1   more so than that, the exact transaction per customer according

2   to price and item or items or service purchased clearly

3   constitutes trade secret information.

4           That doesn't end the inquiry though.  Because as the

5   Cytodyne court noted there are still two other questions.  One,

6   would disclosure of that information cause harm.  Clearly in

7   this case I find that disclosure of that information would.

8   First, I can presume that because Inter City is a direct

9   competitor of Somet Tire.  They are geographically near each

10  other.  They have both acknowledged selling to the same

11  marketplace and selling the same or very similar products and

12  services.  So I can presume that.

13          Now Inter City argues that this information is for

14  the most part at least stale.  That it goes back several years

15  and that insight into these transactions from say five years

16  ago, or six years ago gives it no competitive advantage and

17  will cause no harm to Somet.

18          Respectfully I must disagree.  It may be one thing if

19  all Inter City were looking for were data say for example for

20  the period of 2007 to 2009.  They are not.  And I understand

21  they're not because their theory of the case is that this price

22  cutting theory, scheme rather, spanned the period of time that

23  it did, i.e., 2006 to 2013.

24          But the data that they're looking for and the

25  aggregation of that data from 2006 or 2007 up until 2013

Proceedings                                         66

1   compels me to find that its disclosure would harm Somet because

2   it includes not just the historical data, but much more current

3   data.  And courts have held that the ability to see the

4   movement of prices and strategy as reflected in the movement of

5   prices and as requested by Inter City here in specific

6   transactions would give Inter City a very clear insight into

7   Somet's pricing policies.  And I accept Mr. Brosnick's argument

8   it would cause damage to Somet.

9        I'm not sure that I necessarily accept the argument

10  that it would cause damage to the wider marketplace.  But I

11  don't really need to to reach that issue, because I do find

12  that it is, it would cause damage to Somet.

13       The third question then ends up being does Inter

14  City's need for the information outweigh Somet's need to keep

15  this information confidential.  This is a more complicated

16  question.  And the answer, the conclusion that I reach is yes

17  and no.

18       The pricing itself is highly relevant to Inter City's

19  theory of the case.  At the end of the day their theory is that

20  Somet was able to obtain from STTC and others Michelin brand

21  tires that were outside of what the pricing should have been.

22  They were at the second tier price which was limited to

23  national accounts.  And there's at least some proof of that.

24  They reference the November 23, 2010 email from Marshal Oliveri

25  to Mike Gavin at STTC where in it says regarding Michelin

Proceedings                                                    67

1    tires, whether they, they couldn't purchase those anymore

2    through the national account.

3         So clearly the prices are relevant if Inter City is

4    going to be able to have any fair opportunity at trial to prove

5    that its theory that Somet was able to acquire these Michelin

6    brand tires at an unfairly low price.  And as a result of that

7    was able to pass that savings on by selling these Michelin

8    brand tires at prices much less than what any contract called

9    for and what Inter City was able to sell them for.

10        So I do find that that pricing information is highly

11   relevant.  I find though that the remainder of the information

12   while marginally relevant, well not marginally relevant, but

13   while fairly relevant is far outweighed by the trade secret

14   designation and the harm that would accrue at a minimum to

15   Somet from its disclosure.

16        As a result of that, here's what I'm going to do.

17   For the period for which computer records do remain and data

18   can be aggregated I'm going to require Somet to produce on a

19   per model, per month basis the average price of each tire.

20   Michelin branded tire.

21        That's the easy part.  The harder part, as we've been

22   discussing, and frankly I've been really wrestling with is what

23   to do regarding the 2007 to 2010 records.  Because I do agree

24   with Inter City that those prices are relevant.  If the scheme

25   is alleged to have occurred then, and certainly the email that

Proceedings                                             68

1    Mr. Connolly referenced is a 2010 email, then clearly the

2    logical extension of my reasoning is that Inter City has to

3    have that pricing data for that 2007 through 2010 time period.

4         The difficulty, as Mr. Brosnick pointed out, is how

5    do we go about getting that information to them when the

6    reality is that their computer systems do not still have that

7    data.

8         As we also briefly discussed Rule 45 allows for cost

9    shifting.  And I'm going to employ that here.  It strikes me

10   that in the interest of trying to balance the undue burden

11   element of this with the need for the information, legitimate

12   need for the information, the use of a third party vendor to

13   help an employee at Somet acquire that information is useful

14   and necessary.

15        The cost of that, as Mr. Connolly volunteered, will

16   be borne by Inter City consistent with the dictate of Rule

17   45(C) that a non-party, which Somet certainly is, not be overly

18   burdened in its obligation to respond to a subpoena.

19        Once that information is culled it won't be provided

20   straightaway to Mr. Connolly.  It will be provided to Somet's

21   counsel to insure that the only information being produced is

22   pricing information.  It's the raw price, not the customer.  So

23   it will be what the Michelin brand tire is and what the price

24   is.

25        That information can be produced in its raw form.  In

Proceedings                                                    69

1     other words on a day-to-day basis.  Because unlike the 2012

2     going forward records, that information is dated and although I

3     certainly understand Mr. Cohen's argument that prices haven't

4     moved much in the last five years, there we're talking about

5     information that is seven to, five to seven years old.

6              So what I envision is culling these invoices,

7     redacting all but the actual date, brand of Michelin or type of

8     Michelin tire, and the price.  Quantity obviously is going to

9     be a part of that too.  But the actual customer and any non-

10    Michelin tire purchases can be redacted.

11             I disagree respectfully but strongly with Mr.

12    Connolly that without knowing the exact customers, or the

13    customer information is so relevant that it outweighs the harm

14    to Somet by producing that.  First of all, my survey of the

15    case law on the issue of trade secret suggests that the

16    customer information, and more so than that as sought here by

17    Inter City exactly what those customers bought, when they

18    bought it and what they paid for it is clearly trade secret

19    information.

20             Although he points out that every truck gets a DOT

21    number and there are truck operator lists, that doesn't

22    identify nearly the specific transaction identification or

23    information that he calls for with respect to the customer list

24    and the customer purchases.

25             Moreover, although Mr. Connolly is correct, the

Proceedings                                                70

1    plaintiff does not have to go out and interview all of its

2    former customers.  It does remain the plaintiff's burden at

3    trial to prove that it lost customers to Somet as a result of

4    this price cutting and it has the ability, or has had the

5    ability to survey those customers.

6           Moreover, with this information it will also be able

7    to show not just what Somet got the tires for, which it already

8    had, and how it got those tires.  But what those prices were

9    that Somet sold the tires at along with the information,

10   presumably that Inter City already had, which is its own

11   prices.  And customers it continued to have and customers that

12   it lost.

13          That to me seems to be the fair and most balanced way

14   of balancing Inter City's legitimate need for the pricing

15   information to prove its theories at trial with the trade

16   secret protective information here.

17          Logistically, do we have any questions about that.

18   What I envisioned was this.  What I envision was in the

19   interest of moving this along give Mr. Brosnick a chance to go

20   back to talk to his folks about that.  And give you folks a

21   chance to touch base.  And then we talk on Tuesday.

22          MR. BROSNICK:  That's fine, Your Honor.  I have three

23   questions regarding clarification of the order you just made if

24   I may ask them?

25          THE COURT:  No, there's -- I'm sorry.  There's one,

Proceedings                          71

1   before we get that, before I forget.  One issue I just realized

2   I did not address.  The cost of Mr. Brosnick's firm reviewing

3   and redacting is going to also be borne by Inter City.  I find

4   that that is the only way because Somet is a non-party to

5   comply with Rule 45(C).

6          Moreover, numerous cases have held that cost shifting

7   may be reasonable and appropriate to offset the otherwise gross

8   inequity of a document production.  So as the court noted in

9   Miller v. Allstate, 2009 West law 700142, Western District of

10  Pennsylvania, 2009, although a non-party responding to a

11  subpoena is typically required to pay its own costs of

12  production, under Rule 45(C) the court must take reasonable

13  measures to avoid "imposing undue burden or expense" on the

14  non-party.  See, Federal Rules of Civil Procedure, 45(C)(1).

15         To determine whether something constitutes an undue

16  burden or expense the court in Miller instructed I should

17  typically assess, one, the relevance of the information sought,

18  which I've already addressed.  Two, the parties need for the

19  production.  Three the breadth of the request.  Four, the time

20  period covered.  Five the request particul-- the particularity

21  of the request.  And six, the burden imposed.  See, Miller,

22  2009 West law 700142 at page two, citing Moores Federal

23  Practice, Section 45.32.

24         Certainly I should also consider whether the subpoena

25  is directed to a non-party.  See, Federal Rule of Civil

Proceedings                                                72

1   <u>Procedure</u>, 45, advisory committee note of 1991.

2           Here this is information, one, I find that Somet has

3   already incurred significant time and expense in responding to

4   multiple subpoenas.  Two, this is information that at least in

5   part quite rightly Inter City has sought.  But, three, it is

6   going to require significant review to make sure that the other

7   information t which Inter City is not entitled does not get

8   produced, which is particularly important.  This is far from

9   simply a matter of making sure that Inter City sees only

10  relevant information.  It's a matter of making sure that Inter

11  City doesn't see a direct competitor's trade secret

12  information.

13          So in the interest of accommodating Inter City for

14  the information it does need and is entitled to under my

15  analysis, i.e., the pricing information, I am going to require

16  Inter City to pay the reasonable fees for Somet's counsel to

17  review and redact any unnecessary information.  What other

18  questions did you have Mr. Brosnick?

19          MR. BROSNICK:  Beginning with that -- I'm not sure

20  because I haven't seen the records which will be the easier way

21  to do it.  But would Your Honor allow the discretion, assuming

22  that it can be done, to whether redact information off of

23  invoices or enter the relevant information, the information

24  Your Honor has determined relevant into a spreadsheet?

25          THE COURT:  As long as, well I don't know whether Mr.

Proceedings                                    73

1    Connolly has an issue with that.  Why don't you folks talk

2    about that.  As far as I can see the only problem, potential

3    problem would be is that somebody would have to be prepared to

4    certify it for authenticity sake and reliability sake at trial.

5              MR. BROSNICK:  That's fair enough.

6              THE COURT:  If it's a business record.  It's

7    something akin to a business record certification.  But that

8    would be the only issue.  But obviously Mr. Connolly is the one

9    who's going to be trying the case so his input on that is

10   essential.

11             MR. BROSNICK:  Okay.  Second is Your Honor going to

12   ascribe any value or maybe ascribe any value to the hours that

13   Somet's employees will have to employ?

14             THE COURT:  I'm going to deny any request in that

15   regard for this reason.  I feel like there's a point where the

16   accommodation impinges on the normal course that even a non-

17   party normally bears its own costs.  Here I've already, because

18   in part at Mr. Connolly's suggestion, required, I'm going to

19   require that the third party vendor be paid entirely by Inter

20   City.  Certainly, as I've said now, Somet's counsel's fees in

21   reviewing and making sure only the appropriate information is

22   produced is going to be paid by Inter City.  To also require

23   compensation of that employee I think would go a step too far

24   towards impinging on the normal process under Rule 45.

25             MR. BROSNICK:  My last question was putting aside

Proceedings                                74

1   issues of when particular pieces of information are used at

2   trial and what the public nature of that is, subject to

3   whatever Judge Herlong will rule in South Carolina I would

4   request that Your Honor order outside counsel only for this

5   information.  So that the information which is still

6   competitively sensitive, even though less so because of Your

7   Honor's ruling, not go to the principals and the business

8   people who are making competitive decisions against Somet.

9       Because it is impossible to unlearn.  Even if someone

10   were to swear on a stack of Bibles I won't take that into

11   account, it is not possible for someone to go from a meeting

12   looking at your competitor's prices for particular models

13   still, and then go to the -- and then later in the day be on a

14   call about how you're going to be pricing.

15       And deciding -- and I understand that later at trial

16   there may be, some of that information may be put towards those

17   witnesses on the stand, but that won't be all of it.  And so,

18   unless and until it's ordered to be unsealed by Judge Herlong

19   for actual use in trial, I would request that it be outside

20   counsel only at the production stage.

21       MR. CONNOLLY:  Your Honor --

22       THE COURT:  Mr. Connolly, what's your response?

23       MR. CONNOLLY:  -- that would make the information

24   useless and we'll just skip -- there's no way that outside

25   counsel can gain the facility required with dealing with Inter

Proceedings                                    75

1    City's vast volume of data and comparison --

2          THE COURT:  I've got it.  I'm inclined to agree with

3    Mr. Connolly.  Particularly because, look, I would certainly be

4    more sensitive to, I think more receptive of that if much more

5    of the information were being turned over.  But since all Inter

6    City is going to see now is essentially pricing data

7    disassociated in the aggregate for the most recent information.

8    And more specific but really again only as to product and price

9    for the older information.

10          I think it's completely unreasonable to expect that

11    counsel alone is going to be able to make actual use of that

12    data in preparing for trial given the price cutting theory.  I

13    do, the other problem with that is there's simply no provision

14    for attorney's eyes only in the existing third party discovery

15    confidentiality order that you folks have with Judge Herlong.

16    So I'm going to deny that.  Yeah, that's essentially it.

17          MR. CONNOLLY:  I have a question, Your Honor.

18          THE COURT:  Yes.

19          MR. CONNOLLY:  The time frame that the Court

20    addressed was that the electronic data would be provided for

21    the extent to which it exists and that --

22          THE COURT:  In aggregate form.  Yes.

23          MR. CONNOLLY:  Yeah.  And then the period stated by

24    the Court for review of documents from 2007 through 2010 I

25    understood Mr. Brosnick to say that the electronic database is

Proceedings                                    76

1   available from 2012 to date?  Is that --

2          THE COURT:  Oh.  So did I leave 2011 unaccounted for?

3          MR. CONNOLLY:  You did.

4          THE COURT:  Yeah.  I mean that would have to be

5   similarly part of the 2007 up production.

6          MR. CONNOLLY:  Okay.  So up to the point in time

7   where the electronic data is available.

8          THE COURT:  Exactly.

9          MR. CONNOLLY:  Yeah.

10          THE COURT:  I mean, yeah.  I didn't mean to make a

11   temporal distinction as much as a qualitative one.

12          MR. CONNOLLY:  Right.  Okay.

13          MR. BROSNICK:  Your Honor, just so it's not lost on

14   the Court, I understand it will be on Inter City's dime, but it

15   will be on Somet's effort and time.  Every month, certainly

16   every year and every month that's added to the produced by line

17   item what price each Michelin tire was sold at makes it that

18   much harder for anyone to, I don't care how many third party

19   vendors are helping, to then go through and produce it anything

20   approaching a relevant.  I mean I don't want to undertake to

21   say to my client because Inter City has claims that are going

22   to trial in two weeks you have to shut down your business for

23   the next --

24          THE COURT:  No that's not going to happen.  What I

25   would hope though is that you have -- look, I'm not going to

Proceedings                                      77

tell you how to comply with the subpoena or what Somet has to
do to comply with the subpoena.  If it requires getting more
individuals involved on the third party vendor side and then
the employee of Somet, who you're going to have do this, you
know, oversee them.  Then that's what you're going to have to
do.

I mean it's not an easy situation, but what I've
tried to do is also sort of address it as best as possible
under the difficult circumstances.  I'm not sure what else at
this point until that production starts rolling I can really
say on that.  If there's an issue you folks will let me know.

MR. BROSNICK:  The only thing I can think of as I sit
here and I listened to my client about it is at least the
outside vendor who we use to produce the purchase side records
has some -- some glance and familiarity of Somet's records.  So
I would propose to use that again.

THE COURT:  Okay.  Is there any objection of that,
Mr. Connolly, since it's in your interest as well to get this
up and running as quickly as possible?

MR. CONNOLLY:  That's something I'm certainly
prepared to talk to Mr. Brosnick and my client about.

THE COURT:  All right.  You folks will talk.  I've
got to tell you, if it helps move those discussions along, it
makes a lot of sense to me and I don't see the downside to Mr.
Connolly or to Inter City from that.  All right.  If there's

Proceedings                                           78

1    still an issue, you folks will let me know next week.  Okay.

2         Lets turn to the -- lets actually turn to the

3    30(B)(6).  I know we said we were going to do the Chase

4    subpoenas first.  But I think to some extent on the 30(B)(6) I

5    can -- have you folks had any further discussions about this?

6    Here's my thought.

7         Number one, the shear number of topics is alarming to

8    put it bluntly, Mr. Connolly.  I mean you are talking about 22

9    sort of mini-categories, but within several of those we've got,

10   well judging from the fact that we get into DD 30 subcategories

11   and one and 30 subcategories in another.  That's 13 and 14.

12        So, look, you know, in part clearly it's in your

13   interest to get this done as expeditiously as possible.  Have

14   you folks had any more discussions about trying to narrow this

15   down or limit, or agree on the parameters of the 30(B)(6)?  And

16   one of the things I wonder is why couldn't that information or

17   the scope be limited to the same topics that for which the

18   subpoena duces tecum, the subpoenas have been complied with?

19        MR. BROSNICK:  Your Honor, that is what we offered

20   before the motion to compel.  That was our offer that was

21   summarily rejected.  Or, excuse me, was, that was our offer

22   that said okay, respondent says okay, we'll take what you're

23   offering but we reserve all our right to go to the Court and

24   get everything else.

25        THE COURT:  Uh-huh.

Proceedings                                          79

1          MR. BROSNICK:  At this point, Your Honor --

2          THE COURT:  Oh, is that the issue that you folks

3    nearly, but didn't ultimately resolve last week, or on Tuesday?

4          MR. BROSNICK:  No.  That was a little bit different

5    issue.  Yeah.

6          THE COURT:  That was a different issue we nearly but

7    didn't actually resolve.  Okay.

8          MR. BROSNICK:  But the idea of now after having gone

9    through all this, all the motion practice, all the burden even

10   without huge expense will still be a substantial burden to get

11   this production done.  The idea of then, presumably at some

12   point after that, having to produce multiple witnesses to

13   address even all of those documents.

14          I mean at the very least, even if it were narrowed to

15   the production prior, we were talking about a minimum of two

16   witnesses.  One of whom is out of the country for some period

17   of time.  I'm just not sure how it could be done.  There's

18   really two separate parts.  There's the burden of doing it and

19   then there's the question of, you know, if you asked me to lift

20   40,000 pounds, yes, it would be a burden, and I just couldn't

21   do it.

22          THE COURT:  Right.  Well wait.  Are you saying, are

23   you saying that somebody cannot give deposition testimony, not

24   according to the 30(B)(6) notice as issued now.  But if it were

25   limited to the materials produced, you're saying that that's

```
                      Proceedings                    80
```

1  impossible?

2       MR. BROSNICK:  I'm saying if it was limited to the

3  materials that were produced in November, the upstream --

4       THE COURT:  Well as well what I've just ordered

5  produced, although it sounds like that production is going to

6  be ongoing while this deposition happens.  So I'm not sure --

7       MR. BROSNICK:  That's another, that's part of the

8  impossibility because we're talking about that's going to take,

9  I don't know how long it's going to take.

10      THE COURT:  Right.

11      MR. BROSNICK:  It's not going to be next week.  The

12 idea of someone getting up to speed on that and being prepared

13 to testify.  And lets take even just the upstream.  Even just

14 the upstream information it would require a minimum of two and

15 possibly three witnesses to cover all of that.  Previously, and

16 I guess should ask is it okay to mention what we discussed in

17 the --

18      THE COURT:  Sure.

19      MR. BROSNICK:  Okay.  Previously we had discussed

20 electing only one employee who would know more.  That

21 unfortunately is the employee who's going to be out of the

22 country for a good chunk of the rest of the month on business.

23 So it might end up having to be the other employee.

24      THE COURT:  Well you could do a video conference dep,

25 couldn't you?

Proceedings                                      81

1      MR. BROSNICK:  He's in China.  I'm not sure what the

2  feasibility of that is.  I honestly don't know.  The other

3  employee I'd have to check, I don't know what her status is.

4  The other employee is Ms. Oliveri who -- the documents, who

5  knows a lot about the accounts payable.

6      She won't know as much about the pricing so it

7  becomes kind of a -- and then there's all the time to review

8  and get up to speed and educate and so forth.

9      If it were converted from a 30(B)(6) to a deposition

10  of a particular individual such that the person might be able

11  to say I don't recall that without violating the subpoena, then

12  certainly the prep time burden would be eased.  But these are

13  all, those are logistical -- and then I'm sure Michelin has

14  something to say about the idea of how quickly that could

15  happen and what the idea --

16      And then on top of that question to Mr. Connolly,

17  will these same people be called at trial?  Because if they

18  will the burden to a non-party I respectfully suggest why not

19  just, you know, do it -- they're the ones who --

20      THE COURT:  Oh, a de bene esse?

21      MR. BROSNICK:  Excuse me?

22      THE COURT:  Were you proposing a de bene esse?  In

23  other words take the deposition and use it as trial testimony?

24      MR. BROSNICK:  Either that or just --.  But, yeah.

25      THE COURT:  Well, my guess is, and it's just a guess,

Proceedings                                    82

1   is that Mr. Connolly is not going to agree to that.

2          MR. BROSNICK:  But I would at least agree that it

3   ease the burden somewhat if the deposition testimony were the

4   trial testimony.  So you wouldn't have Somet employees being

5   burdened by having to testify twice in a two, three, or four

6   week stand.

7          MR. CONNOLLY:  Well we don't have subpoena power to

8   compel Somet's employees to come to South Carolina.  So that's

9   easy.

10         THE COURT:  There is that.

11         MR. CONNOLLY:  There is that.

12         THE COURT:  All right.

13         MR. CONNOLLY:  Your Honor, I, if Mr. Brosnick agrees,

14  I think it might serve all of the parties and the Court's

15  interest if we take a recess and I go over the list of 30(B)(6)

16  topics with Mr. Brosnick.

17         THE COURT:  I think that's a great idea.

18         MR. CONNOLLY:  And we try to work out a feasible way

19  of getting that done.

20         THE COURT:  I think that's a great idea.

21         MR. CONNOLLY:  Okay.

22         MR. BROSNICK:  Before we go any further I know my

23  client won't agree to anything unless -- well if they're

24  ordered to I guess they'll have to.  But, I'll put it out

25  front.  They're going to make the same request about cost

Proceedings                                          83

1   shifting on this.  Because it's going to be the same issue of

2   even more time.  And this time unlike most of the going through

3   line items will be my time.

4          THE COURT:  Uh-huh.

5          MR. BROSNICK:  And, you know, I hesitate to send them

6   January's bill with this monthly bill.

7          THE COURT:  Okay.  Well lets -- we'll, I'm not so

8   sure on that cost issue as I was about the last one because a

9   30(B)(6) as to a Somet rep was I think fairly inevitable.  I

10  mean it's happening now.  But it's certainly not outside the

11  pail of discovery.  But that all obviously presupposes that

12  ultimately the subpoena is cut, the subjects are cut down to

13  something that I would regard as reasonably accomplishment.

14         MR. BROSNICK:  I mean part of the problem, and this

15  more my commentary and I apologize in advance, this whole

16  process encourages what happened in this case, frankly.  It

17  tells me that I -- practice, but it tells attorneys go on a

18  fishing expedition.  Worse case scenario --

19         THE COURT:  Well I mean, look, I understand Mr.

20  Brosnick.  But I'm certainly not going to agree to a fishing

21  expedition.  So, look, you folks put your heads together and

22  then when you're ready, take all the time you need.  You can

23  take the jury conference room if you want.

24         Do we need to -- look, if counsel on the phone wants

25  to stay on, you're more than welcome to.  At least from where

Proceedings                                    84

1   the Court stands I don't need to detain you anymore than you

2   need or want to be.

3        MS. FENNELLY:  Your Honor, this is Kathleen Fennelly

4   and Mr. Herzog our apologize to the Court having dropped off.

5   He made a prior commitment.  I would just like to reach out to

6   him and see what his thoughts are.

7        THE COURT:  I'll leave it to you folks.  But all I'm

8   saying is if anybody, I don't know if Mr. Lasala is on.  If

9   anybody needs to move on to other things it's not a problem

10  from where the Court stands.  So, and if you want to stay on

11  that's fine too.

12       So we're going to go off the record.  We're going to

13  take a recess.  And when you folks are ready, Mr. Brosnick, Mr.

14  Connolly, you'll let me know.  Okay.

15       MR. CONNOLLY:  Thank you, Your Honor.

16       THE COURT:  All right.

17       MR. LASALA:  Thank you, Your Honor.

18       THE COURT:  Thank you.

19       MS. FENNELLY:  Thank you.

20       (45 minute recess.)

21       THE COURT:  All right.  We are back on the record in

22  the Michelin Inter City matter.  Mr. Brosnick, did you want to

23  put something on the record?

24       MR. BROSNICK:  Yes, Your Honor.  At the end of Your

25  Honor's order when we were trying to clarify what documents and

1   how they would be produced, what information and how it would

2   be produced, Your Honor in response to Mr. Connolly's

3   observation, I think, if I understood you correctly, changed

4   the original order to say that line item per transaction

5   pricing would be produced up until the time when electronic

6   discovery --

7           THE COURT:  Yeah.  I did not -- if you infer from

8   that a change, I certainly didn't intend to change.  Look, in a

9   perfect world you'd be able to aggregate all of the data.  But

10  because of limitations of Somet's computer system you cannot.

11  So for that which you can aggregate and produce in the

12  computerized form, fine.  For that which you can't I don't see

13  an alternative.

14          MR. BROSNICK:  What I'm saying, what I thought Your

15  Honor's rule was that in the older data it's not as

16  competitively sensitive and so it's okay to have line item.

17  But when you get into 2011, 2012, at some point in 2012, that

18  data, at least according to Mr. Cohen's unopposed,

19  uncontradicted testimony, is still competitively sensitive.

20          So I would respectfully request if -- that the order

21  be line item through 2010 and then even if we have to do it --

22  once you manually enter it into a spreadsheet or manually get

23  all of the line items the work involved in then aggregating it

24  is another hour.  So I would say for 2011 and whatever portion

25  of 2012 before they start having electronic data if you

Proceedings                              86

1   aggregate it and provide it on the monthly list, as the

2   electronic option.

3       THE COURT:  Mr. Connolly, do you want to be heard on

4   that?

5       MR. CONNOLLY:  It's only meaningful if we can get to

6   the pricing per unit, Your Honor.  I don't know what the

7   aggregation that he's talking about is going to look like.

8       THE COURT:  The aggregation he's talking about

9   essentially would be on a per month, per model basis.  Same as

10  for going forward what the pricing was.  It's exactly what's

11  going to be produced for example for 2013.  And I assume all of

12  2012.

13      MR. BROSNICK:  Well not, as I stand here, Your Honor,

14  I'm not sure --

15      THE COURT:  Whatever the computer records allow for.

16      MR. BROSNICK:  -- how far back it goes.  If it goes

17  back to -- it goes back to some point in 2012.  But I'm not

18  sure when.

19      MR. CONNOLLY:  We would prefer the specific line item

20  pricing, Your Honor.  That's what's available in the documents

21  and frankly that's what allows for an apples to apples

22  comparison.

23      THE COURT:  Okay.  I have considered the parties'

24  arguments on this issue.  And for the reasons I articulated

25  earlier I'm going to grant Somet's request.  I was unaware that

Proceedings                                    87

1    that could be converted to an aggregation point.  I'm certainly

2    more comfortable with that, particularly because as Mr. -- as

3    defense counsel rather noted -- strike that.

4         As Mr. Cohen, what I meant to say earlier, not Mr.

5    Brosnick, as Mr. Cohen noted in his declaration, affidavit

6    rather, that information including back to 2011 is in fact

7    sensitive.  He points out for example that in discussing the

8    prices, for example, paragraph 13 of his affidavit he groups

9    the 2011 data largely with the 2012, 2013 data.

10        For the reasons I've already articulated I find

11   information produced in that form is evidently consistent with

12   what I've already determined is sufficiently necessary for

13   Inter City to present its case here beyond the restrictions of

14   the fact that it's trade secret information.

15        So, I will allow the 2007 data forward to be produced

16   in the aggregate form.  For anything before 2011, that will be

17   produced in the redacted line item form.

18        All right.  What did you folks conclude by way of the

19   30(B)(6)?

20        MR. BROSNICK:  Your Honor, let me start with, I feel

21   like there are three -- before we dive into the granular, there

22   are three issues.  First, I'm going to reiterate for the record

23   and in case my client decides to appeal, we believe that, Somet

24   believes that having to sit for a deposition after all of this

25   is going to be, is an undue burden and the subpoena should

1   simply be quashed.  That's -- to the extent there is any, going

2   to be any deposition, the burden objection, a large part of

3   where the burden comes from, and this came out of the meeting

4   Mr. Connolly and I just had, comes from the idea that no one

5   Somet employee knows a lot of this.  And in many cases, I

6   suspect, and some cases I know, no one really remembers what

7   the issue was for that 2008 transaction.

8         So having this be a 30(B)(6) deposition imposes the

9   burden of having to do a lot of document review and then have

10  individual people educate one person, or produce multiple

11  witnesses.

12        What I propose, if there's going to be any

13  deposition, is to pick one person who is most knowledgeable

14  about the most of the subjects and make it a deposition of that

15  person.  Such that if that person doesn't -- if the person --

16        THE COURT:  So it's a personal knowledge deposition.

17        MR. BROSNICK:  Right.  So, for example, if what is

18  most important is the, you know, the purchases of Michelin

19  tires or the use of the credit cards, then someone who knows

20  about that, but that person may not know about, you know, why

21  that transaction or whose handwriting that is on a particular

22  2009 invoice.  You know, or what relationship Somet might have

23  had with one of the 38 entities that's listed in all the sub-

24  items.

25        THE COURT:  Uh-huh.

1        MR. BROSNICK:  And just for completion.  The third

2   one which kind of dovetails with the second is timing.  We're

3   going to need at least according to how I understand Your

4   Honor's order, Somet has been ordered to undertake a pretty

5   mammoth information document review and production.

6        The idea of, and then depending on how two comes out,

7   if it's 30(B)(6) or an individual, and equally burdensome

8   education process and further review is specific.  The idea of

9   trying to do this on a time frame of a week or two is going to

10  be an even greater burden.

11       THE COURT:  All right.  So what is Inter City's

12  response to that?

13       MR. CONNOLLY:  Your Honor, as a result of the meeting

14  that we just had we've eliminated 12 of 22 categories.  And one

15  of the remaining ten categories I think is going to be fairly

16  limited.  The remaining ten categories also are largely

17  duplicative of category one, which is a category concerning the

18  transactions reflected on the documents produced by Somet in

19  connection with the October 3 subpoena.

20       But as to that narrowed field of topics, Your Honor,

21  we would like a 30(B)(6) representative who can address those

22  subjects.  And what I would encourage the Court to do is to

23  walk through what remains so that the Court can see that we're

24  not looking for a what will necessarily be a large number of

25  individuals testifying or a huge burden to be imposed upon

```
                         Proceedings                        90
```

1   Somet Tire in responding to this 30(B)(6) deposition.  We do --

2            THE COURT:  All right.  So why don't you just give me

3   by number what's left.

4            MR. CONNOLLY:  Okay.  Two.

5            THE COURT:  Okay.

6            MR. CONNOLLY:  Three.

7            THE COURT:  Okay.

8            MR. CONNOLLY:  Four.

9            THE COURT:  Okay.

10           MR. CONNOLLY:  Six.

11           THE COURT:  Okay.

12           MR. CONNOLLY:  Eight.  And then let me come back to

13   nine because that's something that I need to explain to the

14   Court what we need.  And it's less than what's stated here.

15           THE COURT:  Well it's going necessarily be because

16   it's already been ruled on by virtue of the subpoena duces

17   tecum.

18           MR. CONNOLLY:  Right.  Exactly.  But, if we can pause

19   there for a moment, Your Honor, one thing that was not clear to

20   me from the Court's order as to the electronic data that will

21   be produced --

22           THE COURT:  Yeah.

23           MR. CONNOLLY:  -- the Court said that Somet is

24   ordered to produce an average price.

25           THE COURT:  Yes.

Proceedings                                    91

1       MR. CONNOLLY:  We request that that be a weighted

2  average price.

3       THE COURT:  I don't know what that means.

4       MR. BROSNICK:  Your Honor, I'll tell you exactly what

5  it means.  It means exactly what Mr. Cohen testified and what

6  we fear.  When we were in there, Mr. Erbesh was able to say,

7  well if I know the quantity and I know the price, then I can

8  derive what their total sales were and their revenue.  It's

9  exactly what we feared.  It's the --

10       THE COURT:  Wait, wait, wait.  Don't characterize it.

11  It's confusing enough.  What does it -- how would one -- if for

12  example it was a per unit, what I had in mind was a per tire

13  price, average per month per brand, or per line of Michelin

14  tires.

15       MR. BROSNICK:  If I give you, lets say because I'll

16  use realistic numbers, if I give you 4,000 invoices, some of

17  those invoices are going to say six tires.  Some of them are

18  going to say nine tires.  Some of them will say two, some of

19  them will say 20.

20       If we could -- the granularly much more burdensome

21  way to do it that Mr. Connolly is suggesting is to take each

22  invoice's average price and then make a weighted average so

23  that you're not just talking about 4,000 invoices, you're

24  talking about each tire on each invoice.  So it's something

25  like 20, 30, 40,000.  I don't know how many thousand.

Proceedings                                    92

1       The other way to do it, which is directionally

2   accurate but not as mathematically precise, and not as capable

3   of being reversed engineered by someone with knowledge, is to

4   just take the invoice price of each and then average all of

5   those because --

6       THE COURT:  On a per unit basis.  Right?

7       MR. BROSNICK:  On a per unit basis, but an average

8   per unit.

9       THE COURT:  Yeah.

10      MR. BROSNICK:  So it wouldn't be weighted.  So that

11  the average would be less precise because an invoice for four

12  tires would have been given equal weight to an invoice with

13  seven tires.  So in theory if you were going to weight it the

14  seven one should have been counted 1.75 times or 1.78 times as

15  much as the one with four tires.

16      But what I'm submitting that the burden of doing that

17  would be substantially greater.  And at the end of the day you

18  will come to the difference in the end, because most of these

19  companies don't -- it's not like one is buying 20,000 tires and

20  the other three.  You're talking about four, seven, twelve, you

21  know.  Over the course of looking at all the invoices it's

22  going to be more or less not the same, but it will be in the

23  same zone.

24      THE COURT:  All right.  I'm going to deny Inter

25  City's request.  This production is complicated and challenging

Proceedings                                    93

1   enough and is on a very short time frame given the trial date

2   without going --.  Plus I'm not so sure based on Mr. Brosnick's

3   representation that there would be that much of a fall off

4   between the average per unit price, which I envisioned, and the

5   weighted price.

6          It would be one thing as Mr. Brosnick points out if

7   in any given month say for one particular type of tire there

8   was one sale for $30,000 with one per unit price.  And then two

9   sales each of four tires at a different per unit price.

10         But in any event, in the interest of moving this

11  along with a realistic eye towards getting this discovery done

12  by the trial date and without unduly burdening Somet, I'm going

13  to deny the request.  Okay.  So where are we back on the Rule

14  30(B)(6)?

15         MR. CONNOLLY:  Okay.  So we're up to eight is

16  included.  Twelve, thirteen, fourteen, and twenty-two.

17         THE COURT:  Give me a second just to review those.

18         (Brief pause.)

19         THE COURT:  Here's a concern I have with your

20  proposal, Mr. Brosnick.  If I were Mr. Connolly I would

21  essentially say, Judge, how do I know I'm not setting myself up

22  for Somet to put up somebody with only a at best gauzy

23  understanding of these particular subjects that we've narrowed

24  this down to and I'm going to be stuck with what I get.

25         In other words it's a fairly significant fall off

Proceedings                                          94

from the 30(B)(6) standard to what you're proposing.  Now it
may be one thing if, for example, Mr. Cohen, for example, could
reasonably be assumed and based on the documents to have at
least sufficient familiarity with these issues such that even
if he is limited to testifying in his personal capacity, Inter
City could be reasonably assured that it's going to get not
necessarily all of the information its looking for, but at
least some critical mass of that information.

          MR. BROSNICK:  I understand, Your Honor.  It wasn't
my suggestion that I would encourage Somet to play games and
put up a --

          THE COURT:  I'm not suggesting that you were.  I
didn't mean to suggest that for a moment.

          MR. BROSNICK:  The way around that, I think, would be
for me to go back to Somet, subject to individuals being
present there and available, to propose three individuals and
kind of give a thumbnail of what they generally know.  And kind
of let, taking into account -- my concern is, and I'll use Mr.
Cohen as an example.  Mr. Cohen, I know, would be knowledgeable
about, you know, the relationship with some of the people, like
for example in number 13, communications with Bill McCabe who
figures in the underlying case.  But he's not going to be able
to identify whose handwriting is on invoices.  And he's not
going to know why a credit card was used on a particular
transaction.

1          Conversely, you could probably go to Somet's accounts

2     payable person, Marshal Oliveri, and she'll probably be able to

3     identify most of that handwriting.  And she may even remember

4     about why a credit card was used on that transaction.  But

5     she's not going to know about why a particular program was

6     negotiated or about some communications with particular people.

7          And I don't want, I want to avoid -- and then either

8     of them or the records person, a third person, may not remember

9     things so clearly from 2007, '08, '09, '10, who knows.

10          And what I want to avoid is one, having to have one

11    person educate the other person and spend all of the time doing

12    that.  Then two, whoever it is go back into the bowels of the

13    records to educate themselves about that which no one

14    remembers.  You know, if you asked me to testify about a case I

15    handled in 2008 I'd have to spend a lot of time getting up to

16    speed.  Even though I actually would probably still be the best

17    person to do it.

18          So that's why, without game playing, and with

19    identifying the three or at most four potential witnesses, I

20    would suggest saying, it will basically, as I said to Mr.

21    Connolly in the room, you can get almost anything you want, but

22    you won't be able to get everything you want.  So pick someone

23    who knows the most and then go with that person and accept that

24    that person won't remember, I don't know, or won't remember

25    other things.

Proceedings                                    96

1        THE COURT:  All right.  Here's what I'd like to do on

2   this.  Mr. Connolly, do you think that if Mr. Brosnick got back

3   to you on say Tuesday or Wednesday with the names of people who

4   could, based on personal knowledge, address the specific items

5   that you have reduced the 30(B)(6) down to, that you would have

6   some basis based on your familiarity with this case and the

7   documents to know whether, who those individuals are and

8   whether you agree, how probably based on the documents would

9   know this particular area?  Here's my concern --

10       MR. CONNOLLY:  Yeah.  I mean I think I would take at

11  Mr. Brosnick's representation.

12       THE COURT:  Yeah.  It's certainly not in Mr.

13  Brosnick's interest, first of all he's, you know, he clearly is

14  an upmost professional and I certainly didn't mean to suggest

15  anything to the contrary earlier.  But frankly it's also in his

16  self interest to try and get, and his client's self interest to

17  get this done as efficiently as possible rather than run the

18  risk of you folks coming back to me or to Judge Herlong.

19  Because --

20       MR. CONNOLLY:  We share that interest.  We want this

21  done efficiently.

22       THE COURT:  Sure.  Of course.  Especially maybe

23  nobody more so because you've got trial in two weeks which

24  leads me to the other point.  I have real concerns about this

25  30(B)(6) not just in terms of the undue burden on Somet.  Look,

Proceedings                                        97

1    if we were talking about, you know, a year before trial or even

2    six months before trial, that would be one thing because I

3    would say look take one 30(B)(6), or this witness, and then

4    come back and let me know if, you know, you feel for example

5    that there's still other areas that you have to have that

6    hadn't been adequately covered.

7         But the reality is here you've basically got two

8    weeks at most.  So the idea that it's realistic, I don't think

9    it's at all realistic that any one or several people even can

10   get completely up to speed on this many different subjects,

11   even as reduced down, sufficient so that everybody would be

12   sure that ever corner of Rule 30(B)(6) is met.  I just don't

13   know that under these circumstances that is entirely realistic.

14        And also cannot overlook the fact that, you know, you

15   folks are going to be busy, particularly Somet with respect to

16   complying with the last subpoena that we dealt with.

17        So here's what I'm considering doing.  I'm

18   considering Mr. Brosnick's suggestion that there be one or

19   perhaps two individuals who are put up to testify in their

20   personal capacity in lieu of the 30(B)(6).

21        I think that particularly with these time constraints

22   that is far more realistic in terms of what the parties can

23   accomplish than just sort of blithely ordering, you know, a

24   30(B)(6) witness or witnesses somehow in the next two weeks to

25   get up and testify and be completely up to speed on these

Proceedings                                    98

1    various topics.

2             I certainly appreciate Mr. Connolly's and Inter

3    City's attempt to cut the subpoena scope down.  But the fact is

4    that still you're talking about a lot of material.  I'm not

5    saying it's, you know, beyond a pail or irrelevant, but just on

6    the face of it.  For example, communications between anybody

7    from Somet in 13, and 30 different people.  Communications

8    between, or payments rather between Somet and any of 30

9    different individuals.  Those two in and of themselves are,

10   could involve becoming familiar with a substantial amount of

11   material.

12            So here's what I'd like to happen.  Mr. Brosnick is

13   going to go back with these identified reduced topics in hand

14   and talk to his folks about -- well do you think, Mr. Connolly,

15   that it would be possible to, if you had to narrow it down even

16   further to must haves in light of the fact that you've got two

17   weeks to do it, that that would be possible?  All I'm thinking

18   is in the interest of trying to move this along.

19            The other thing I could do is simply require Mr.

20   Brosnick to go back and go, this person can testify about these

21   particular areas.  This person can testify about these

22   particular areas from personal knowledge.  And then you pick.

23            MR. CONNOLLY:  Pick one?  Or pick two?

24            THE COURT:  Depends on, I can't say that yet because

25   it depends on for example whether a particular -- if every one

Proceedings                                99

1   person is every topic is going to be only one person such that

2   -- I'm sorry.  Strike that.

3        If it's going to be a different witness for every

4   single topic, then we're going to be talking about taking more

5   than one.  But if hypothetically for example a particular

6   witness can testify about some significant sum of those, then

7   it would be a lot more receptive to that one person.  So I

8   can't answer that yet until I know what Mr. Brosnick comes back

9   with.

10       MR. BROSNICK:  Your Honor, it's going to be the

11  latter.  The people who know about something.  There's also

12  another wrinkle to this.  I mean, Your Honor, looked at number

13  13, which I agree is a good example.  There may be someone who

14  has a good idea about what Somet deals with these people in an

15  accounts payable concept, but maybe not in a customer service

16  kind of go out to a ball game concept.  And so you wouldn't be

17  able to cover all angles of it.

18       THE COURT:  Right.  So we're going to need to get, so

19  I cannot -- there's no way I'm going to commit at this point to

20  whether it's one or more than one deposition until I see what

21  that list is.  But quite frankly I really do think that that is

22  exactly why it's in Inter City's interest to speak with Somet

23  counsel about what specifically is the most significant in

24  terms of the information for the deposition.  And that way it's

25  narrowed down to where it becomes a lot more feasible to get it

Proceedings                                              100

1    done in one or two.  All right.

2           And then how are you going to need to get this

3    together?  Should we be talking again like Thursday?

4           MR. BROSNICK:  I think so.  Honestly I have no idea.

5    While Mr. Connolly was conferring with his client I emailed the

6    principals at Somet and asked them.  I normally try not to

7    schedule client calls on a weekend.

8           THE COURT:  Yeah.

9           MR. BROSNICK:  I asked them, tomorrow I have

10   something with my daughter, I asked them if they could do a

11   call on Sunday.  Sunday is a work day in Israel at least and I

12   know one of them will be working.

13          THE COURT:  Okay.

14          MR. BROSNICK:  So I'll know more next week.  The file

15   clear I spoke to at the last break was stunned and didn't even

16   know how to start to go about it.  So I need to plum this and

17   figure out how it can be done.

18          THE COURT:  All right.  So why don't we do this.

19   We'll talk, oh, wait, Thursday I can't do it.  How about

20   Friday.  All right?  By that point you folks should know either

21   you can work this out in a way that makes sense or you can't.

22   So lets talk Friday at 10:00 a.m. on the phone.  Does that make

23   sense.

24          MR. BROSNICK:  That's fine, Your Honor.

25          THE COURT:  All right.  All right.  Chase subpoenas.

Proceedings                                              101

1   Chase and J.P. Morgan.  Lets get this part done.  Here's my

2   first question.  So we've got the Chase subpoena and the J.P.

3   Morgan Chase subpoena.  Referencing the J.P. Morgan subpoena,

4   do I have jurisdiction under Rule 45 to consider that subpoena

5   and whether to enforce it?  It has a return address in Boston.

6              MR. CONNOLLY:  What I'm looking for, Your Honor, is

7   to see if it was served on a corporate agent.

8              THE COURT:  Well it does say, that's what I was

9   wondering too.  Because it does say care of C.T. Corporation

10  System.  But that, I can't tell whether the Boston address

11  refers to J.P. Morgan or C.T., or for some reason both.  I

12  honestly can't tell.

13             MR. CONNOLLY:  I believe that this was served on C.T.

14  Corporation in Boston.

15             THE COURT:  All right.  So I don't know what I can do

16  with that one.  I mean that's not a discretionary issue either,

17  as I understand it.  Why don't we do this.  A lot of the

18  issues, I think, probably overlap in any event.  So --

19             MR. BROSNICK:  It's that one that is the broader.  I

20  think the accurate way -- to say, the second Chase subpoena

21  includes and then adds a lot more.

22             THE COURT:  Because it adds additional counts.

23             MR. BROSNICK:  Additional counts, and additional

24  things being requested.

25             THE COURT:  Yeah.  Well unless somebody can show --

Proceedings                                    102

1    look, all I see on there is a Boston address which Rule 45 very

2    clearly says --

3        MR. BROSNICK:  The only thing I can say and I

4    honestly haven't researched the jurisdictional element, but

5    since we're talking about Somet and its employees records, we

6    could say that even though they're in the custody of Chase they

7    are, that they are Somet's records.  I -- on that one.

8        THE COURT:  I think we're getting a little -- I'm

9    afraid we're getting a little cute with Rule 45 there.  Look,

10   here's what I'll do.  I'm going to hold off on dealing with

11   anything on that now.  You folks think you can resolve the

12   issue and come back and pitch me on how I have jurisdiction I'm

13   more than happy to hear you.

14       I'm just not, as a Magistrate Judge, not inclined to

15   rewrite, you know, several centuries of federal jurisdiction.

16   While I certainly understand what you're saying, Mr. Brosnick,

17   and it has some facial appeal, but I'm afraid it starts to get

18   a little cute with Rule 45.

19       That has us then dealing with the Chase subpoena.

20   The one I'm talking about specifically was the subpoena to

21   Chase Bank on November 25th for banking records.  There are

22   five items.  Account origination documents for a particular

23   account, all records for that account for the period of January

24   1, 2006 to the present.  Item number three is all records

25   regarding all accounts at Chase for January 1, 2006 to the

Proceedings                                    103

1   present held by Yuhiel (phonetic) Cohen, Hali Cohen (phonetic),

2   Somet Tire, including but not limited to bank statements,

3   debit, credit, deposits, withdrawals, cancelled checks front

4   and back.

5          Item number four is all communications with Michelin

6   North America and a Visa regarding any of those accounts.

7   Presumably that would be already encompassed with item number

8   three.  And item  number five is any and all accounts regarding

9   the Michelin advantage card accounts held by the Cohens or

10  Somet.  It strikes me again probably encompassed by item number

11  three.  But in any event.

12         So let me hear from you Mr. Connolly.  The first is,

13  well I don't expect you obviously to identify the account

14  number.  What is that account generally and how is it any

15  different than what you're looking for with regard to Yuhiel

16  Cohen, Hali Cohen, and Somet in item number three?

17         MR. CONNOLLY:  May I have a moment, Your Honor?

18         THE COURT:  You take all the time you need.

19         (Brief pause.)

20         MR. CONNOLLY:  -- substantially reduce the scope of

21  this.

22         THE COURT:  Okay.

23         MR. CONNOLLY:  The credit card number that is

24  referenced in this subpoena, the account number that's

25  referenced in this subpoena is a credit card account.

Proceedings                              104

1        THE COURT:  Okay.

2        MR. CONNOLLY:  And what we're interested in are the

3   statements during the relevant time frame for that account.

4   That's it.  And then as to request number five, well just

5   getting back to the first one.  That would mean that we could

6   essentially limit our request to item two for the time frame

7   referenced and the account referenced, and limit it to

8   statements.  Monthly statements.

9        THE COURT:  Okay.

10       MR. CONNOLLY:  And then --

11       THE COURT:  What about item three?

12       MR. CONNOLLY:  We don't need three or four.  And as

13  to five the Michelin advantage card accounts held in the name,

14  it says the above referenced individuals and entities.

15       THE COURT:  Yes.

16       MR. CONNOLLY:  The relevant names and entities would

17  be essentially two names for the same person,  Yuhiel Cohen,

18  Hali Cohen, or Somet Truck Center, New Jersey, LLC.

19       THE COURT:  So all right.  So item number five seems

20  to be pretty much intact then.  Right?  That's basically what

21  it was before.

22       MR. CONNOLLY:  It is.  It is.

23       THE COURT:  Okay.

24       MR. CONNOLLY:  But just to clarify that's

25  specifically what that refers to.

Proceedings                              105

1          MR. BROSNICK:  Sorry, I guess --

2          THE COURT:  So here's what we're down to then.  Item

3   number two, but it would just be basically the credit card

4   statements for that particular account number for that period

5   of January 1, 2006.

6          MR. CONNOLLY:  We could limit it through April of

7   2013.

8          THE COURT:  Okay.  And then the only other item is

9   essentially item number five.  It's Yuhiel and Hali Cohen and

10  Somet for item number five.

11         MR. CONNOLLY:  Right.

12         MR. BROSNICK:  Respectfully, Your Honor, number five

13  encompasses everything in one through four and --

14         THE COURT:  No, no, no. He's offering to modify it.

15  Essentially what he wants known item number five is any and all

16  basically credit card statements, if I understand correctly,

17  for Michelin advantage card account held by Yuhiel Cohen, or

18  under the name of Hali Cohen, or Somet for the, limited though

19  to the Michelin advantage card.

20         MR. CONNOLLY:  That's it.

21         THE COURT:  So that's different it seems to me than

22  the prior request.

23         MR. BROSNICK:  But in asking only for statements, or

24  all documents related to that card?

25         THE COURT:  It's not asking --

Proceedings                                    106

1      MR. BROSNICK:  All documents related to that card.

2      THE COURT:  Is that -- hold on.  Is that account, the

3  account number, the unidentified account number, is that

4  different than a Michelin advantage card or the same?

5      MR. BROSNICK:  I don't know, Your Honor.  We

6  weren't --

7      THE COURT:  Well I'm asking him.

8      MR. BROSNICK:  Okay.  We weren't served with the

9  subpoena.

10     MR. CONNOLLY:  I, as I sit here, Your Honor, I don't

11  know.  There are a number of credit card numbers that are in

12  the documents produced by Somet.  At least one of them is a

13  Michelin advantage card.  And I don't know if this is that one.

14     MR. BROSNICK:  Your Honor, harkening back to what Mr.

15  Connolly and I discussed on Tuesday that we were unable to work

16  out a global deal, hopefully it will help us avoid the

17  jurisdictional issue, what I would least take back to Somet and

18  propose, if we could narrow this -- the primary problems with

19  this on the credit card side is it asks for the entire

20  statement which goes to a whole lot of other stuff.

21     THE COURT:  Yeah.  I'll be honest with you.  I have

22  real concerns about, particularly if, you know, if he's, if

23  he's using it for personal expenses it's really, really

24  invasive.

25     MR. BROSNICK:  And then the other aspect is that it

Proceedings                                     107

1   goes beyond Somet.  It goes to a person.  If this were --

2          THE COURT:  It's going to a principal.

3          MR. BROSNICK:  Yes.  Yes.  If this --

4          THE COURT:  So that I'm a little more receptive to in

5   the capacity though of operating at Somet.  In capacity of

6   operating as, you know, do you know Cohen private citizen who

7   just uses it to go the movies, for example?

8          MR. BROSNICK:  I'll go a step further.  Here's what I

9   would propose.  If it's -- I don't know the answer to this as I

10  say, but I'm going by my own history of having had a corporate

11  card at a number of different firms, and I used the same card

12  to buy my, to pay for my car here as I do to pay for my wife's

13  birthday present.

14         Because, and I think on point because I have points

15  on it, I think that's roughly the case here.

16         THE COURT:  Right.

17         MR. BROSNICK:  But if this request and not within

18  Your Honor's jurisdiction arguably but the other -- and also if

19  it were narrowed to Michelin advantage cards in Somet's name or

20  Mr. Cohen's name.  And the statements came to me and then I

21  redacted all but things that show the line item of Michelin

22  tire purchases, I would propose that to my client as a

23  reasonable --

24         MR. CONNOLLY:  I'm completely fine with Mr. Brosnick

25  screening the statements and redacting everything but Michelin

Proceedings                                    108

1    transactions.  Or Service Tire transactions.  Service Tire or

2    Michelin.  I'm fine with that.

3            MR. BROSNICK:  Well Service Tire for Michelin Tires,

4    or Service Tire for anyone?

5            THE COURT:  Michelin.  That's the theory of the case.

6            MR. CONNOLLY:  Yeah.  But you can't tell from a

7    credit card statement what's being purchased.  You see the

8    vendor and it doesn't list the products that are purchased.

9            THE COURT:  Well then how are you going to know if

10   it's part of the scheme?

11           MR. CONNOLLY:  Because we've got a lot of documents

12   from Service Tire.  So there's the ability to cross reference.

13           THE COURT:  That's pretty reasonable.

14           MR. BROSNICK:  Fair enough.

15           MR. CONNOLLY:  But I don't think that the scope

16   should be limited to only the Michelin advantage card, which I

17   understood Mr. Brosnick to say, because there were other credit

18   cards used that are the subject of these subpoenas that are not

19   Michelin advantage cards, but which were used to purchase

20   Michelin tires.

21           THE COURT:  Well all right.  Hold on.  Lets just deal

22   first with the Chase subpoena.

23           MR. CONNOLLY:  Okay.  So I'm fine with --

24           THE COURT:  What's that other account number though?

25           MR. CONNOLLY:  I have a --

Proceedings                                    109

1      THE COURT:  The one that's redacted, you know --

2      MR. CONNOLLY:  Yeah.  See I've got the redacted and

3  the unredacted.  And it's only one account.

4      THE COURT:  Okay.  Look, here's what I'll tell you.

5  I can't speak to the J.P. Morgan Chase subpoena.  But I do

6  think it would help you folks if, at least with respect to the

7  Chase account, if Mr. Connolly can show Mr. Brosnick where on,

8  for example, that other account on the Chase subpoena it was

9  used to purchase Michelin tires, I would regard that as

10 relevant and subject to production.

11     But I do think that this could be pretty

12 expeditiously resolved applying the exact same process.  So the

13 only thing that gets turned over is the redacted version of the

14 credit card statement and included only in there is Michelin or

15 Service, STTC purchases for the relevant time period.  I think

16 that gives, the plaintiff is consistent exactly with what I had

17 already found with regard to the October subpoena to be

18 discoverable under the price cutting scheme alleged.

19     I think that very fairly accounts for something that

20 I'm very sensitive to, which is that Mr. Cohen's completely

21 unrelated uses of that card, whether it's to go to a ball game

22 or the movie theater, or to a grocery store, whatever.  That's

23 not relevant and shouldn't be turned over.  This accommodates

24 all of those concerns.  And I think it's pretty reasonable.

25     MR. BROSNICK:  As to, if we're talking about one or

Proceedings                                110

1   two cards, remember we're talking about seven years times 12

2   months worth of statements.  And if we're talking about one or

3   two cards I would concede on that.  We're talking about I think

4   something like 12 or 14 cards because we've seen numbers are

5   used by -- remember, this is now I guess technically off the

6   record because we're talking about --

7           THE COURT:  I've ruled on the other one.  They're not

8   going to, which is all the more reason why you folks should

9   figure out a way to work that out.

10          MR. BROSNICK:  We're talking about Ms. Oliveri's

11  husband's card.  We're talking about Ms. Oliveri's son's credit

12  card.

13          THE COURT:  No, no.

14          MR. BROSNICK:  We're talking about Felix, you know --

15          THE COURT:  Mindonca (phonetic), Cruez, Siegal.

16          MR. BROSNICK:  Right.  We're talking about a lot of

17  people's cards, which is why I tried to limit it to Michelin

18  advantage and only to Mr. Cohen and Somet.  I really -- Somet,

19  but I'm okay.  I understand.  Mr. Cohen also, but only as to --

20  the theory of the case as I understood it, I'm speaking as a

21  non-party so I don't know as well as they do, is that

22  supposedly this Michelin advantage card wasn't available to an

23  entity like Somet or someone like Mr. Cohen.  And it's not like

24  I can get an American Airlines card even though I don't work at

25  American Airlines.

```
                        Proceedings                    111
```

1    THE COURT:  Uh-huh.

2    MR. BROSNICK:  And if that's the case and they --

3    then okay, I see that.  But as to other credit cards that were

4    used for Michelin purchases, especially if it's reflected in

5    our production already, it's another means of showing something

6    that's already been produced.  We've produced the invoice for

7    that purchase from Service Tire.

8    And the 30(B)(6) witness will be able to testify if

9    that deposition is ordered, if the invoice was produced here,

10   it's marked on it and it's self evidence, why do you need, then

11   you need to go to that much more effort when we're already

12   going to be ridiculously burdened to find it was paid for by

13   this credit card not that one.  With the except of the Michelin

14   advantage card, which I understand is a separate -- is --

15   THE COURT:  Look, here's what I'm going to do.  I

16   certainly understand that argument.  I'm not ruling on the J.P.

17   Morgan subpoena.  I do think your arguments though are well

18   taken.  And obviously Mr. Connolly has the decision to make in

19   terms of whether he wants to work out a resolution along those

20   lines or, you know, go up to Boston and have this dispute

21   again.

22   So I would certainly encourage the parties with

23   regard to the J.P. Morgan Chase subpoena to work out some sort

24   of agreement along those lines or along similar lines.  Because

25   if it is true that Inter City already has the invoices that

Proceedings                                     112

1   show the sales of those, I can understand to some degree the

2   purchasing information being contextually interesting.  But it

3   becomes then a matter of degree.  And if you're going to have

4   it with respect to Cohen's part, you already have, it sounds to

5   me like you're going to be able to introduce evidence regarding

6   the use of the Michelin advantage card, which your theory is

7   they never should have been able to use anyway because they

8   weren't a national account.

9          It's a question of whether you have enough or whether

10  you want to pursue more.  But I do think that with regard with

11  the subpoena that is within my jurisdiction I think we have our

12  answer there.

13         It will be credit card statements for the

14  unidentified account and the Michelin advantage account

15  redacted to, Michelin advantage account of course to the extent

16  it's held by in the name of Yuhiel Cohen, Hali Cohen, or Somet,

17  redacted solely to reveal purchases of Michelin tires and/or

18  purchases from STTC for the relevant time period.

19         MR. BROSNICK:  Just a clarification, Your Honor.

20  With respect only to this subpoena is Your Honor ordering, if a

21  card is held is not a Michelin advantage card, is that still

22  going to be -- what I proposed was to limit it to Michelin

23  advantage card or Yuhiel Cohen's card.

24         THE COURT:  We're on the Chase subpoena, right?

25         MR. BROSNICK:  Yes.

Proceedings                                          113

1        THE COURT:  It's either Michelin advantage.  It's

2   either the, the only accounts at issue are the one for which

3   the number on the subpoena is redacted.  Right?  And then any

4   Michelin advantage card held by either Yuhiel Cohen, Hali Cohn,

5   and/or Somet.

6        MR. BROSNICK:  The trouble is, as I stand here today,

7   I've never seen an unredacted version of the subpoena.  It

8   wasn't served on anyone at Somet.  That, and I'm being a little

9   bit facetious, but that -- identify the account could be Ms.

10  Oliveri's husband's card.  Or it could be some -- I have no

11  idea whose credit account that is, which is why I want an order

12  from this Court limiting it to only if it is an account of

13  Somet or Mr. Cohen.

14       THE COURT:  Well let me come back to -- if the card

15  was used to purchase Michelin tires such that you're going to

16  be getting any responsive information, it's going to be limited

17  to those purchases anyway, in which case it's a credit card

18  that would have been used to purchase the tires.  So it would

19  strike me as relevant.

20       But the question really more is before we send Somet

21  off to go run this down and review it and redact it, I do think

22  that we're entitled to particularly defense counsel is entitled

23  to at least some understanding of what account this is.

24       I'm working off of the assumption, which I assume is

25  a safe assumption, that this is an account that was used

```
                         Proceedings                    114
```

1   separate and apart, A, that it's separate and apart from those

2   that were sought by the J.P. Morgan subpoena.  And, B, that's

3   on there because the plaintiff has, or Inter City has evidence

4   that it was used to purchase Michelin brand tires.

5           MR. CONNOLLY:  That is correct.

6           THE COURT:  All right.  What else do we know about

7   the account?  Who was the account -- whose name was the

8   account?  Do we know?

9           MR. CONNOLLY:  Don't know.

10          THE COURT:  All right.  Here's what I'm going to do.

11   I'm going to, I'm going to table that particular account until

12   Thursday when we talk.  By then Mr. Connolly you'll have gotten

13   that answer.  You'll have given it to defense counsel.  And

14   then we'll revisit that issue.

15          But I'll tell you now my inclination is if it is an

16   account that was used by Somet to purchase Michelin tires then

17   I do regard it as discoverable because it's imminently

18   consistent with Inter City's price cutting theory.  And it's

19   not unduly burdensome because it's one other account number and

20   Mr. Connolly has modified that subpoena down to where

21   compliance with it could hardly be described as unduly

22   burdensome.

23          MR. BROSNICK:  Your Honor, I just want to confirm my

24   understanding of that is, is all of the other records and bank

25   statements and all that, are we down to just the monthly --

Proceedings                                   115

1        THE COURT:  The credit card statements.

2        MR. BROSNICK:  Just the monthly credit card

3   statements.

4        THE COURT:  Yes.  Yeah.  So we're going to revisit

5   that issue on Thursday.  All right.

6        MR. CONNOLLY:  We're speaking on Thursday or Friday?

7        THE COURT:  Oh, Friday.  I'm sorry.  Friday.  Friday,

8   Friday.  I didn't mean to add to the confusion.  But I'll tell

9   you now that's my inclination.  If the card was used to

10  purchase Michelin tires I'm going to allow the production of

11  the redacted version of the statements.

12       MR. CONNOLLY:  I appreciate the Court's ruling and my

13  only concern is that we can get the documentation to Mr.

14  Brosnick today as to where that number came from.  And assuming

15  that we can make the factual connection to a Michelin tire

16  purchase, I'm reluctant to wait another week.

17       THE COURT:  That's fine.  Look, here's what you'll

18  do.  You'll talk to him.  I would hope at that point you folks

19  can work it out given the, my comments on the record.  If you

20  can't you'll let me know on Tuesday.

21       MR. CONNOLLY:  Okay.

22       THE COURT:  Okay?

23       MR. BROSNICK:  Unfortunately I'm going to ask Your

24  Honor if I can use your room for another call that I --

25       THE COURT:  Of course.  I think we're just about done

```
                    Proceedings                    116
```

1    in any event for now.

2           MR. CONNOLLY:  And so assuming we can work it out

3    then we'll notify Chase as to the limited contours of what the

4    Court has --

5           THE COURT:  Exactly.

6           MR. CONNOLLY:  Okay.

7           THE COURT:  Exactly.

8           MR. BROSNICK:  The last point I was going to make

9    other than renewing my request to quash all of these because my

10   client may want to --

11          THE COURT:  Understand.  I understand.  It's denied

12   and you can set whatever appellate capacity you and your client

13   deem appropriate.

14          MR. BROSNICK:  Is to say with respect to the

15   hopefully not 30(B)(6), the modified deposition and this latest

16   redacting of more credit card requests to seek the 45 cost

17   shifting as well on that.

18          THE COURT:  You can see that I'm not ruling on that

19   right now.  I don't need to rule on that right now.  I have no

20   idea whether the deposition is going to go any way.  In terms

21   of the redactions to the credit card statements we can address

22   that on Thursday.  You folks talk.  All right?

23          MR. CONNOLLY:  Friday.  Friday.

24          THE COURT:  All right.  You go, you can use the

25   conference room as long as you need.

1          MR. BROSNICK:  Thank you, Your Honor.

2          THE COURT:  Mr. Brosnick.  Mr. Connolly, safe trip

3    back.  Who ended up staying on the phone?  Is there anything

4    else we need to do on the record?

5          MR. BROSNICK:  I don't believe so.

6          THE COURT:  All right.  We can go off the record.

7          (Conclusion of Proceedings at 2:21:07 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                             118

CERTIFICATION

I, JANICE T. WARNER, Transcriptionist, do hereby certify that the 117 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

S/ *Janice T. Warner*                    January 19, 2015
Signature of Approved Transcriber          Date

Janice T. Warner, (AAERT #00315)
King Transcription Services
901 Route 23 South, Center Suite 3
Pompton Plains, NJ 07444
(973) 237-6080